[Crim. No. 212. Fourth Appellate District.—July 27, 1931.]

THE PEOPLE, Respondent, v. R. L. STEWART, Appellant.

Curtis Hillyer and Irve C. Boldman for Appellant.

U. S. Webb, Attorney-General, and Warner I. Praul, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The defendant was jointly charged with one Clarence R. Wilson in an indictment returned by the grand jury of San Diego County with the violation of the Corporate Securities Act of the state of California. The indictment contained three counts. The material part of the first count may be thus abbreviated:

"That the said Robert L. Stewart and Clarence R. Wilson . . . did wilfully, unlawfully, knowingly and feloniously sell, offer for sale . . . to Hulda C. Holmquist . . . 3050 units . . . of the California Land Buyers Syndicate, a Delaware corporation for a consideration other than cash . . . in nonconformity with and with intent to violate the provisions of the Amended Permit dated April 9, 1928, issued to said corporation by the Commissioner of Corporations of the State of California. . . . "

The second count, in about the same language, charged a similar sale of 667 units of the same stock to William B. Gross. The third count similarly charged a sale of 1000

units to I. W. and Vitulia E. Randall. The two defendants were tried together, the jury finding Wilson not guilty on all counts and Stewart not guilty on the first count and guilty on the second and third counts. The court denied a motion for a new trial and this appeal is from that order and from the judgment.

It appears from the evidence that the California Land Buyers Syndicate was organized under the laws of the state of Delaware, and that it filed its articles in the office of the Secretary of State in California and also in the office of the county clerk of San Diego County, where its principal place of business was located. The principal purpose of the company was to buy, sell and deal in real estate. On July 1, 1926, a permit was issued to the company by the commissioner of corporations of the state of California, authorizing it to sell and issue certain of its shares of stock, as follows:

"1st—To sell and issue 40,000 shares of its investment shares and 40,000 shares of its common stock, in units of one investment share and one common share, at and for the selling price of $26.00 per unit, cash, lawful money of the United States, for the uses and purposes recited in its application."

On April 9, 1928, an amended permit was issued by the commissioner of corporations, authorizing it to sell certain remaining stock "at and for the price of $30 per unit, cash, lawful money of the United States, for the uses and purposes recited in its application." The defendant was regularly licensed as a security salesman in the state of California. From the organization of this corporation he acted as its fiscal agent and, as such, had direct supervision over the sale of its stock, receiving a commission of twenty per cent on all sales of stock made by the company. He also had charge of the office of the syndicate, with several employees working under him. The other defendant, Wilson, was a licensed real estate salesman and in charge of the real estate department of the syndicate.

In reference to the Gross transaction, involved in the second count of the indictment, it appears that in July, 1929, Gross was the owner of a certain parcel of real property in San Diego, for which he was asking $25,000. He took the matter up with Wilson, who examined the property and ap-

praised its value at from $18,000 to $20,000. Gross went to the office of the company and discussed the proposed transaction with the appellant, who told him that the syndicate had paid ten per cent dividends and had money to pay more, and showed him stacks of dividend checks being made out for delivery to the stockholders. Gross signed a letter addressed to Wilson offering to sell his land to the syndicate for $20,000, or "accept 667 units in California Land Buyers securities both investment and common for the above described property." This letter was handed to appellant and by him presented to the board of directors. The directors adopted a resolution to buy the Gross property at the price of $20,000. The appellant informed Gross that when the deal was completed he would receive the shares of stock in the company. Gross signed a stock subscription agreeing to purchase 667 units of stock in the syndicate for the sum of $20,010. An escrow was opened with a title company, Gross depositing a deed conveying his property to the syndicate, with instructions to record it upon the payment of $20,000. The syndicate deposited in this escrow its check for $20,000, with instructions to deliver the check to Gross upon the receipt of a deed for the property. Upon the closing of the escrow the appellant delivered to Gross 667 units of this stock. At the same time the appellant laid the $20,000 syndicate check before Gross and said: "Now in order to make this legal you will have to sign the back of this check." Thereupon Gross indorsed the $20,000 syndicate check and delivered it to appellant, together with $10 in currency. Appellant deposited this $20,000 check in his own account in the First National Bank, and gave his own check to the syndicate for $20,000 in payment for the stock. It further appears that at the time of the presentation of the $20,000 check payable to Gross, the syndicate's balance in the bank amounted only to $404.26, aside from the credit afforded by appellant's $20,000 check, which had been deposited to that account. It also appears that at the time of the presentation of the $20,000 check drawn in favor of the syndicate, Stewart's balance in the bank was insufficient to cover that check without the credit afforded by the $20,000 credit of the syndicate check, which had been deposited to his account.

In the Randall transaction, covered by the third count of the indictment, a similar situation appears. It was agreed that the syndicate would purchase from the Randalls certain real property owned by them in San Diego for $30,500, and the Randalls agreed to purchase 1,000 units of stock in the syndicate at the price of $30 per unit. Randall signed a stock subscription for 1,000 units, and an escrow was opened. The checks were handled in the same manner as in the Gross transaction. At the time the company's check was issued for $30,500, its bank balance was only $87.36. At the time Stewart's check was issued for $30,000, his bank balance was $35.62. These figures are exclusive of the deposit in each account of the other check.

Appellant first urges that the verdict is contrary to the law and the evidence. It is earnestly urged that these transactions were, in fact, cash sales, within the meaning of the terms of the permit. Appellant says: "The real question is does the evidence show that they were in truth and fact cash transactions, or does it show that they were exchanges of real property for stock." It is urged that in modern business usage, checks are equivalent to cash, and also that since each party to the transaction received what he desired, no harm was done. Conceding that in modern business checks are frequently used in lieu of cash, and also that under many circumstances they may be considered equivalent to cash when they are covered by sufficient funds actually in the bank upon which they are drawn, a different situation is here shown. It fully appears that there was nothing behind either one of these checks except the other check, which was itself worthless. In fact, four sales are represented in these two transactions for a total of over $100,000 and the only real money or real credit used is the $10 in currency. While it may be said that each party received what he wanted, the entire transaction is a trade, both in fact and effect. As was said in *People* v. *Kuder*, 98 Cal. App. 206 [276 Pac. 578, 580]:

"All the respective accounts consist of contemporaneous credits and debits, in spite of which there were no funds ever in the possession of the bank, and it requires no degree of expert bookkeeping to reveal the fact that it received nothing and disbursed nothing through the checking

system of the depositors, and the corporation received nothing for the certificate of stock issued to appellant."

In the case before us the corporation received nothing for its stock in each transaction, except a piece of real estate. Nor can it be said that the result and effect are the same, since the corporation was organized for the purpose of dealing in real property. It is well known that almost universally the trading price of real estate is much higher than the price asked in a sale for cash. Not only would that fact make such transactions as these inequitable as to persons who purchased stock in the corporation for cash, but such exchanges as are represented here would further reduce the assets of the corporation, to the detriment of those buying stock for cash, since the higher the normal price of the real estate purchased, the higher would be the appellant's commissions, as he was paid twenty per cent on the stock issued. While appellant argues that the subsequent financial difficulties of this corporation were caused by a general deflation of real estate values, it may well be that a large part of the loss suffered by the stockholders occurred through the inflated values of the real estate taken over through the violations of the permit to sell stock, with which appellant is charged.

Appellant next insists that it does not appear that he knowingly violated the terms of the permit. While it is conceded that where a person commits an act in violation of a statute, it is presumed both that he intended the natural consequence of his act and that he knew of the existence of the law violated, it is argued that this presumption does not extend to the violation of such a permit as is here involved. In this case, it appears that the appellant had actual knowledge of the terms of the permit and that he even consulted other parties in an effort to determine what could be done to evade it, without violating its terms. He attempts to excuse his act by the claim that he was advised by the attorney for the corporation that the method pursued would not be a violation of the statute. Not only do we think this would not be a sufficient excuse but the attorney for the corporation testified that when the first of the transactions involved in the indictment came up, he told the appellant that land could be bought from a party and stock sold to the same

party, provided the purchase of the stock was handled entirely distinct from the sale of the land; that is, if the purchase of the stock and the purchase of the land were entirely distinct and each stood on its own feet; and that this could be done if the matter was so handled that if a line were drawn right down to the usual stock deal and the usual land deal, each would be distinct and stand on its own feet. This attorney also testified that he later inquired of the appellant as to one or two of these transactions which had gone through, as to "whether each party had actually a credit that was good and cashable". The appellant replied that "it had been". In *People* v. *McCalla*, 63 Cal. App. 783 [220 Pac. 436], it was held that good faith was not to be considered as a factor in the determination of the defendant's guilt on a charge of violating the provisions of the Corporate Securities Act. Nor do we think the rule should be any different where, as in this case, the defendant is charged with violating a permit which is issued in accordance with the provisions of that act. Not only must it be presumed that a defendant knows that a permit must be obtained from the commissioner of corporations before certain securities may be sold, as provided for in the statute, but he must also be presumed to know that a failure to conform to the terms of the permit, when issued, is also a violation of law under the statute. Were this not true, not only would the very object and purpose of the statute be frustrated, but of necessity, the guilt or innocence of an accused would then turn upon his own opinion. Not only is this true, but the evidence here shows that the appellant had actual knowledge of the terms of the permit, and in our opinion it is also sufficient to support the finding of the jury that the appellant knowingly violated the statute in failing to conform to the terms thereof.

At the conclusion of the People's case, counsel for Wilson made a motion for a directed verdict as to him, which motion was by the court denied. It is contended that this was error as to appellant, and that under section 1100 of the Penal Code the court was required to direct a dismissal so that appellant might have had the benefit of his co-defendant's testimony. It nowhere appears that the trial court was ever of the opinion that sufficient

evidence had not been produced to put Wilson upon his defense. It also appears that no motion to have the defendant discharged under that section was ever made. Nor does it appear that that section was ever called to the attention of the court, or that any desire of the appellant to have the testimony of his co-defendant was ever expressed or called to the attention of the court. A motion for a directed verdict is not the same thing as the discharge contemplated by that section. The jury is not bound to follow the advice of the court in directing a verdict, while section 1100 refers to an act within the power of the court to control. Where applicable, it may be made at any time before the evidence is finally closed. No error as to appellant is shown in refusing this request for a directed verdict made at the close of the People's case. We may also add that no showing of injury is made, as appellant frankly states that had he been able to call his co-defendant as a witness, he does not know what his testimony would have been.

Appellant next claims that section 4 of the Corporate Securities Act is unconstitutional, as attempting to vest legislative powers in an administrative officer, it being claimed that legislative functions are here delegated to the commissioner of corporations. It is also contended that the act confers arbitrary powers upon the commissioner of corporations and attempts to give to regulations imposed by him the force and effect of public law, and that this may not be done. Appellant admits that the case of *People* v. *Kuder,* 93 Cal. App. 42 [269 Pac. 198, 202, 630], is somewhat opposed to his contention and quotes the following from that case:

"Yet in all cases where the question has arisen, it has been held that the commissioners of various departments may be invested with and exercise the power to make reasonable rules and regulations, and to determine any fact or state of facts upon which the law makes, or intends to make, its own action depend."

He then argues that in so holding it was not the intention of the court to go so far as to hold that where the power to make rules and regulations is delegated to an administrative officer, that such officer may be guided in so doing only by his own conscience. He then cites a number of

cases from other jurisdictions, which it is claimed hold that such rules and regulations have not the force and effect of public law. As was said by the Supreme Court in *People* v. *Kuder, supra,* in reference to the same section of the Corporate Securities Act which is here attacked:

"We think it unnecessary to look outside our own state for authority upholding the right of the legislature to empower and direct a commission or board created by it to make reasonable rules and regulations, to investigate into affairs of the business, profession or occupation over which it is given jurisdiction, and exercise sound discretion as occasion may arise in granting or denying rights which are conditionally conferred. Respondents do not complain that the conditions imposed by the permit issued to them were unreasonable, oppressive or arbitrary. Since, therefore, these precautionary measures in the interests of public safety may, as we have observed, be delegated to and performed by a board, commission or officer theretofore duly constituted by the legislature, respondents manifestly are subject to the regulations and conditions prescribed by the commissioner of corporations in this instance, and are not legally justified in complaining of the source from which they emanated."

In *Agnew* v. *Daugherty*, 189 Cal. 446 [209 Pac. 34], the court said:

"The passage in the above quotation from the statute which allows the commissioner to issue a permit authorizing the applicant to sell his securities 'upon such terms and conditions as the commissioner may in said permit provide' must be read in connection with the context which provides that the commissioner must inquire into the method of doing business and shall ascertain if the same is fair, just and equitable and that the methods used in disposing of them would not work a fraud upon the purchasers thereof. The terms and conditions to be prescribed in the permit must not be such as would make a greater burden than is consistent with safety and security. . . . If the commissioner should refuse to issue a permit except upon conditions which would be unjust, unfair or inequitable to the applicant, doubtless he would have the right to have such permit revised and reformed so as to make it equitable and fair, but we cannot assume that he will impose such conditions in advance of his action."

While we agree with appellant that the power of the commissioner of corporations, in the respect under consideration, has other limitations than the dictates of his own conscience, the fact remains that no showing is here made that the terms of the permit issued in this case were not fair, just and equitable, nor that they were not reasonable in view of the purpose for which the corporation was organized. We think the point raised is sufficiently answered by the case just cited, and the case of *People* v. *Kuder, supra.*

■ Complaint is made of the giving of the following instruction:

"You are instructed that payment for stock by check payable on presentation and drawn against a sufficient fund on deposit to meet it, at the time of presentation, was payment in cash as though the payment had been made in coin, lawful money of the United States, in the absence of fraud."

We are unable to see how this could have prejudiced the defendant. Not only is there no evidence in this case to show that the checks under consideration complied with the rule there laid down, but the last clause of the instruction merely pointed out that where fraud is shown, the general rule would not apply. A check given for the very purpose of violating the law, though otherwise good, would not comply with the terms of the permit. ■ The following instruction is also assigned as error:

"I further instruct you that if you find from the evidence beyond a reasonable doubt that the people have shown that the entire transactions as set forth in the indictment and known from the evidence as the Holmquist transaction, the Gross transaction and the Randall transaction, was not a *bona fide* sale for cash but was a proceeding carried out by the defendants for the purpose of evading the provisions of the permit for the sale of stock in violation of the Corporate Securities Act, then it is your duty to find the defendants guilty as charged in the indictment."

The only argument here made is that it may not be a violation of the statute to evade it. Although this may be true, an act done for the purpose of evading the statute which is also "in violation of" the statute, would not come within the evasions which, according to appellant, are permissible.

■ It is next argued that the evidence of the bank accounts of the syndicate and of the appellant were improperly admitted, since no foundation was laid as to the qualification of the witness to testify. The witness in question testified that for ten years he had been comptroller of the First National Trust & Savings Bank; that as such he had charge of the records of this bank and of the accounts of its depositors; that he had with him these records and that he was able to determine from the records the condition of the accounts; that the files of the bank were under his supervision; and that a great many people had to do with the making up of the bank records, but that these people were under his general supervision. We think the foundation for the admission of this testimony was sufficiently laid (*People* v. *Woollacott,* 80 Cal. App. 278 [251 Pac. 826] ; *People* v. *Kuder, supra; People* v. *Weaver,* 96° Cal. App. 1 [274 Pac. 361]).

■ It is next urged that the court erred in refusing the following instruction :

"You are instructed that nothing contained in the books of the California Land Buyers Syndicate or in any records of the California Land Buyers Syndicate nor any testimony based thereon nor any conclusions which you might draw, nor anything contained therein is binding upon these defendants or either of them in the absence of proof, satisfying your minds beyond a reasonable doubt, that they knew of the contents of said books or records or that the said books or records were made or kept under their direction or supervision."

Appellant relies upon the case of *People* v. *Doble,* 203 Cal. 510 [265 Pac. 184], as showing this was reversible error. In connection with this, it is pointed out that the appellant was asked if he knew how much money the syndicate had in their bank account when the $20,000 check involved in the second count of the indictment was drawn. He replied: "No, I did not know the exact amount of money that they had on that particular day." In the Doble case, one of the particular defenses urged was that the defendant knew nothing of the excess sales of stock in the corporation which had been made by other parties and that if any had been made, this had been done against his orders. In the case before us, no issue was made of any lack of knowl-

edge on the part of the defendant and all of the evidence tends to show that he had such knowledge except this one answer of the appellant, which is itself very qualified. It appears from the evidence that the appellant was the principal promoter of this company and its fiscal agent; that he had charge of the company's office; that he attended all meetings of the board of directors; that he advised the board as to whether he had sufficient stock subscriptions to take care of the transactions here involved; that he usually furnished the directors with information as to how the bank balance stood; and that in reference to the transaction involved in the first count of the indictment, appellant had stated that they did not have cash enough in the bank to buy the property at that time. It also appears that the appellant's qualified statement that he did not know the exact amount of money in the bank on a certain day, was made only in reference to the transaction involved in the second cause of action and that no evidence to that effect was given in connection with the third count. While we are inclined to the view that the instruction should have been given, in view of the entire record, we are unable to hold that an issue was sufficiently presented to make the refusal of the instruction prejudicial error. In addition, it may be said that the evidence plainly shows that these transactions were entered into in pursuance of a plan to trade stock in the corporation for real property, instead of selling the stock for cash. Under such circumstances, even the fact that the corporation had not sufficient money in the bank to meet the check, and consequently any knowledge of the appellant upon that subject were not essential elements of proof. The appellant consulted a number of parties for the purpose of ascertaining how such a trade could be made without directly violating the law. Irrespective of whether the plan suggested to him would have been legal, it clearly appears that he did not follow it. We think the evidence shows that in truth and in fact these were not sales of stock for cash, but that they were exchanges of stock for real property.

Appellant maintains that he is the victim of circumstances, that he was dominated by the board of directors of the corporation, and that he merely carried out instructions given him by the board. There is ample evidence that the dom-

ination was the other way, and that the appellant went far beyond any instructions shown to have been given him. Neither may it be said that the offense was a technical .one only, and that no harm resulted therefrom.

For the reasons given, the order and judgment are affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 10, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 24, 1931.