[Civ. No. 325. Fifth Dist. July 31, 1964.]

J. C. REAVES, JR., et al., Plaintiffs and Respondents, v. FREMONT VALLEY DEVELOPMENT CORPORATION et al., Defendants and Appellants.

Robert M. Miller, James F. Healey, Jr., Donald J. Burdine, Frank X. Ball, William W. Berryhill, Everett H. Aspenson, Arthur G. Bowman and John R. Engman, for Defendants and Appellants.

Borton, Petrini, Conron, Brown & Condley, George A. Brown and William L. Caraway for Plaintiffs and Respondents.

CONLEY, P. J.—The judgment in this case forecloses two purported mechanic's liens, totaling $19,894.25, including interest to the date of the judgment, besides costs, on lands near Mojave in Kern County. The appellants maintain that at the time of the trial there was no lien upon the land in question for the reason that nothing was then due to the

respondents because they had accepted stock in Fremont Valley Development Corporation in lieu of monies previously owed to them for labor performed, and in any event because the purported liens were filed too late.

The plaintiffs, J. C. Reaves, Jr. and Wilbur Rickett, doing business in Kern County under the name of Rickett and Reaves, a copartnership, had been hired by Wendell Stevens and Leo C. Smith, acting as partners under the name, California Land Development Company, to make surveys and do other engineering work in the development of several subdivisions in the Mojave area. That they did the civil engineering work properly is a conceded fact; it is also admitted that the unpaid balances, for the reasonable value of their services, are $7,632.96 on tract 2388 in the south half of the southeast quarter of section 29, township 31 south, range 37 east, M. D. B. & M., and $9,384.03 on tract 2414 in the north half of the southeast quarter of section 29, township 31 south, range 37 east, M. D. B. & M. There is no question but that those amounts, together with interest as provided by law, were in fact due from Messrs. Stevens and Smith and their partnership for services performed by the plaintiffs prior to the stock transaction hereinafter mentioned. The chief question involved is whether by accepting 36,000 issued shares of the capital stock of Fremont Valley Development Corporation pursuant to express contract and in accordance with the unambiguous terms of the permit of the Corporation Commissioner, the plaintiffs received full payment of the obligation owed to them and, consequently, lost the right to file mechanic's liens on the property.

The defendants and appellants, Enosuke Amemiya and Mrs. Enosuke Amemiya, now owners of the land by reason of a sale to them under their trust deed, which secured the payment of a loan of $100,000, and the trustee, Abstract Guarantee Corporation, lost their preferred position if the mechanic's liens filed thereafter by plaintiffs were in fact good. The filing of the mechanic's liens took place after the loan by the Amemiyas, but, as the engineering work started before the loan, the mechanic's liens, if in fact good, had precedence over the lien of the trust deed.

Messrs. Stevens and Smith in promoting their plans to develop and market their subdivisions took preliminary steps to form the Fremont Valley Development Corporation, which was to acquire all of the assets of the partnership, California Land Development Company. As promoters, they secured the

issuance of the necessary permit by the Corporation Commissioner, which is in evidence as a portion of plaintiffs' exhibit 12; the permit is specific and contains peremptory instructions with respect to the Fremont Valley Development Corporation's application. The permit, conditioned by an escrow provision, provided that 1,500,000 shares should be issued to California Land Development Company in return for a conveyance of all of its assets.

It is then said: "The applicant then proposes to issue an additional 400,000 shares to a group of approximately 71 persons and company in cancellation of an indebtedness in the amount of $400,000.00, it appearing that said persons are creditors of the predecessor partnership. One of the assets of said proprietorship is a parcel of land consisting of approximately 40 acres which the applicant proposes to improve with the proceeds from the sale of its shares to the public."

Another provision of the permit refers to the proposed sale of 161,775 shares to the public at par for cash to meet the requirements of budget items set forth in full.

With respect to the sale of stock to creditors in lieu of cash payments to them, the commissioner requires that: "After applicant shall have sold, received the consideration for and issued all the shares authorized to be sold and issued under paragraph 1 hereof, to sell and issue an aggregate of not to exceed 400,000 of its shares to the persons named in the application filed January 22, 1960, as amended, or any of them, in consideration of the cancellation of applicant's indebtedness to them in the amount of $400,000.00 as set forth in its application, $1.00 of said indebtedness to be cancelled for each share so issued." The permit then provides for sales of stock to subscribers and states that permission is given upon certain specified conditions including the requirement that a true copy of the permit be furnished to each purchaser, that subscriptions should be taken for all shares referred to, that there should be named an escrow holder, approved by the commissioner, and that "when issued all documents evidencing any of said securities shall be forthwith deposited with said escrow holder, to be held as an escrow pending the further written order of the said Commissioner; that the receipt of said escrow holder for said documents shall be filed with said Commissioner; and that the owner or persons entitled to said securities shall not consummate a sale or transfer of said securities, or any interest therein, or receive any consideration therefor, until the written consent of said Com-

missioner shall have been obtained so to do." The transaction was thus carried on under the detailed surveillance of one of the principal administrative agencies of the State of California.

In consummation of the plan, a series of writings show on their face a strict adherence to the requirements of the commissioner's permit.

Under date of March 3, 1960, Messrs. Rickett and Reaves wrote to Mr. Stevens stating: "We are willing to accept payment in stock at par value in the full amount of the bill providing we have your written offer, either by you and your partner as individuals, or by the corporation, to purchase such stock from us at par value within six (6) months after recordation of the subdivision map. The stock would be issued to us in the full amount of the estimated cost as soon as you have sold all of the stock which has been issued for cash or as soon as the escrow is removed on the stock and cash collected and you are authorized to issue the stock. I suggest that stock be issued in the amount of 13,000 shares. We will make whatever adjustment is necessary in the final accounting and either return a portion of the stock to the corporation if the total bill is for less, or you can reimburse us if the $13,000.00 is exceeded."

Although the reference in that letter was only to services performed on tract 2388, the actual final transaction was for 36,000 shares covering both tracts above referred to and a proposed third tract which was never actually surveyed. The documents in evidence in connection with this transaction are three in number.

Plaintiffs' exhibit 12, which contains a copy of the permit of the Corporation Commissioner on its reverse side, reads as follows:

"FREMONT VALLEY DEVELOPMENT CORPORATION
3421 West Eighth Street
Los Angeles, California

"No. C-53

"Stock Subscription Agreement.

"I, Rickett & Reaves, Engineers, hereby subscribe for 36,000 shares of the $1.00 per value common stock of Fremont Valley Development Corporation, a corporation, in cancellation of Thirty Six Thousand dollars ($36,000.00) of indebtedness owed to me by the California Land Development Company.

"I acknowledge receipt of a copy of the permit of the Com-

missioner of Corporations authorizing the taking of this subscription, printed on the reverse side of this subscription. I hereby state that I am a bona fide resident of the State of California.

"Dated: March 4, 1960.

"RICKETT & REAVES, ENGINEERS
by J. C. Reaves, Jr. (partner)
Subscriber

2901 H Street
Address

Bakersfield, California
City and State

"Accepted:

FREMONT VALLEY DEVELOPMENT CORPORATION
a corporation

By /s/ Wendell D. Stevens

March 4, 1960 ''

Plaintiffs' exhibit 11 is on the letterhead of the California Land Development Company, is also dated March 4, 1960, and reads as follows:

"March 4, 1960

"The cancellation of indebtedness in the amount of $36,000.00 as shown on subscription agreement #C-53 of Fremont Valley Development Corporation, is for money to be paid for engineering work on tracts at the City of Fremont Valley.

"RICKETT & REAVES, ENGINEERS
By /s/ J. C. Reaves, Jr.

"CALIFORNIA LAND DEVELOPMENT COMPANY

By /s/ Leo C. Smith

By /s/ Wendell D. Stevens ''

Plaintiffs' exhibit 10 is also on the letterhead of California Land Development Company and reads as follows:

"To: RICKETT & REAVES, ENGINEERS

"We, the undersigned, do, as a company and individually, agree to buy from you at par value 36,000.00 shares of the Fremont Valley Development Stock. This stock represents

the amount of stock received by you for cancellation of indebtedness. Subject stock is to be purchased in six (6) months after recordation of subdivision map.

"CALIFORNIA LAND DEVELOPMENT COMPANY

By /s/ Leo C. Smith

By /s/ Wendell D. Stevens ''

Stock Certificate No. 44 of the Fremont Valley Development Corporation was accordingly issued to Rickett & Reaves, Engineers, for 36,000 shares of the capital stock of Fremont Valley Development Corporation.

The record thus shows the detailed permit for the issuance of stock of the new Fremont Valley Development Corporation executed by the appropriate state agency and the accession to this plan by the plaintiffs in explicit and unambiguous language. There can be no doubt as to what the Corporation Commissioner meant in his permit; neither can there be any uncertainty on the face of the instruments in question as to whether the plaintiffs were other than wholehearted and understanding participants. Appellants properly point out that there is no ambiguity in the documents; in the place of a money payment, the appellants accepted 36,000 shares of stock of Fremont Valley Development Corporation and the California Land Development Company agreed to purchase this stock at par within six months after the maps of the subdivision were accepted.

The respondents now maintain that the preliminary statement made in the letter of March 3, 1960, had two conditions: (1) that the maps of the subdivisions would be filed (and they never have been), and (2) that the engineers would be paid in full for the stock at par if the market value of the stock should fall below par. We fail to note any condition in the letter with respect to the necessity of filing maps; the reference to the filing simply sets a time within which the engineers would be paid for the stock.

The situation noted in *McMurray* v. *Brown*, 91 U.S. 257 [23 L.Ed. 321], quoted with approval in *Martin* v. *Becker*, 169 Cal. 301, 312 [146 P. 665, Ann. Cas. 1916D 171], is present here: "Cases may arise, undoubtedly, where the rights and responsibilities of the parties are so completely defined by the contract, that neither party is at liberty to claim anything beyond the terms of the contract, if the contract is in all respects fulfilled." In the *Martin* v. *Becker* opinion,

at pages 309-310, it is pointed out that it is sometimes true that the taking of additional or different security operates to destroy an existing actual or potential mechanic's lien; it does so in four classes of cases: "1. Where the destruction is worked by virtue of a positive declaration of law; 2. Where it is worked by the agreement and contract of the parties; 3. Where it is worked by necessary intendment growing out of the agreement of the parties, in that the taking of the later security is inconsistent with the continued existence thereafter of the lien, and, finally, 4. Where the nature of the earlier or later security, as that it is concealed or undisclosed, gives rise to a situation where it would partake of fraud upon other claimants to permit the earlier lien to be held valid, whereupon equity interposes and declares it to have been waived or lost by the taking of the later security, or what is in effect the same, erects a bar to its enforcement." ■ The present case falls under the second subdivision above—when the abandonment of the right to a lien is worked by the agreement and contract of the parties. The plaintiffs said specifically in one of their writings that they took the stock in lieu of monetary payment, and it would work a gross injustice to the Amemiyas if the plaintiffs were now entitled to repudiate their solemn contract and rescind the abandonment of their original right to payment in money. ■ Furthermore, to find that the parties involved did not act in good faith in accepting the permit at its face value would be to assume a species of double dealing on their part; they presumably were acting in good faith and meant what they said; it would be doing violence to the administrative functions of the Commissioner of Corporations to permit participants in the plan to so modify their own undertaking after the event.

■ Quite properly, our courts insist upon the strict observance of the terms of permits issued for the sale of stock by the Corporation Commissioner. In *Reed* v. *Norman*, 41 Cal.2d 17, 19-20 [256 P.2d 930], it is said: "Section 26100 of the Corporations Code provides that securities issued in nonconformity with the terms of a stock permit are void, and it is well settled that stock must be sold and disposed of in strict compliance with the provisions of the permit authorizing its issuance. (*Mannion* v. *Baldwin*, 217 Cal. 600, 603 [20 P.2d 678].) Shares have been held void for noncompliance with a cash requirement where they were, in fact, issued in exchange for real property (*Holmquist* v. *Kent*, 219 Cal. 231

[35 P.2d 977]; *People* v. *Stewart,* 115 Cal.App. 681 [2 P.2d 195]), for personal property (*Mannion* v. *Baldwin, supra,* [partnership interest]; *Herkner* v. *Rubin,* 126 Cal.App. 677 [14 P.2d 1043] [merchandise]), for promissory notes (see *Imperial Live Stock & Mtg. Co.* v. *Tracy,* 208 Cal. 205 [281 P. 50]; *Gridley* v. *Tilson,* 202 Cal. 748, 753 [262 P. 322]) or for personal services (see *Barton* v. *El Encanto Apartments, Inc.,* 216 Cal. 500, 502 [14 P.2d 501])."

Do respondents contend that the permit was actually complied with? The observation contained in their brief is rather startling; it seems to approve a device to evade the strict terms of the permit: "At the time the corporation was making application to the Corporation Commissioner for a permit to issue stock, it was necessary that Smith and Stevens show as favorable a financial statement to the Commissioner as was possible. One way to show such a balance sheet picture to the Corporation Commissioner was to eliminate the cash obligations shown to Rickett and Reaves by having them send in plaintiffs' Exhibits 11 and 12 to the Commissioner, indicating on their face that Rickett and Reaves would accept the stock."

The parties, of course, had no right to mislead the Corporation Commissioner or to evade his requirements; we assume that they did not do so but acted in good faith and meant exactly what they said in the documents which they signed.

Respondents maintain that by some philosophical legerdemain, their clear undertaking to accept 36,000 shares of stock in place of the monetary value of their work was in fact subordinate to a secret understanding of entirely different import and that in fact they did not agree to take the stock in cancellation of their money claim, but only contracted to take it as additional security for the debt even though nothing was said about security in the permit or in their contracts.

Some confusion may well have resulted from the fact that Messrs. Stevens and Smith were in fact the organizers of Fremont Valley Development Corporation, and that each of them was closely allied with both the partnership and the corporation. There is no finding that one of these organizations was technically the *alter ego* of the other. Insofar as the record is concerned, Fremont Valley Development Corporation was a corporate individual separate and distinct from Messrs. Stevens and Smith and the partnership. The evidence concerning the intricate proposals later made in connection

with the attempted revivification of the subdivision projects should be considered with the fact in mind of the disparate entities, but close cooperation, of the promoters.

It is true that there is evidence that, in the year following the stock transaction, the Fremont Valley Development Corporation sent a form letter to its creditors and that one copy went to Messrs. Stevens and Smith. The appellants contend that this was only because the subdividers admittedly owed two other sums to plaintiffs on completely separate work, and that they did not consider them creditors with respect to the monies involved in the present litigation; appellants also contend that this letter and the talk that followed it were proposals to compromise and that, therefore, the evidence concerning them should not have been admitted over objection.

After receipt of the form letter from Fremont Valley Development Corporation seeking a composition of credits and claims, Mr. Reaves and his attorney, Mr. Brown, went to Los Angeles and had a conference with Mr. Stevens in the office of the Fremont Valley Development Corporation. Upon their return to Bakersfield, the plaintiffs forwarded what appears to be a self-serving letter:

"January 31, 1961

"Fremont Valley Development Corporation
3421 West 8th Street
Los Angeles 5, California

Attn: Mr. Leo Smith, President

"Gentlemen:

"We have given considerable thought to our problem of collecting for our engineering work as per our letter of January 20, 1961. We greatly appreciate your willingness, as indicated in our meeting at your office in Los Angeles on the 25th, to protect our interests. We particularly appreciate the offer to give us a demand note evidencing the debt and a deed of trust to secure it in return for the 36,000 shares of stock in the Fremont Valley Development Corporation, which we now hold as security. The stock obviously has lost most of its value, no longer is adequate security, and you indicated you were not in a financial position to purchase it as provided in our agreement in partial payment of the debt.

"We have decided in lieu of taking the note and deed of trust as offered, that we will obtain better protection under the mechanic's lien law, but feel bound to return the security

of the stock at the same time and, therefore, we have endorsed it and are returning it herewith, the same as we would have done had we taken your note and deed of trust. "You will receive notice shortly that we intend to file a mechanic's lien for the work. While we do not want to upset your plans for pulling this operation out of its present financial difficulties, we are taking this course because our work was performed well prior to the deed of trust recently put on the property in favor of Enosuke Amemiya and our lien should be before his. A mechanic's lien will put us in that position.

"Thank you for your cooperation.

> "Yours very truly,
>
> RICKETT and REAVES
>
> By /s/ J. C. Reaves, Jr."

This was the first time that anyone had used the term "security" in any writing. The endorsed stock certificate for 36,000 shares was returned in the letter to Fremont Valley Development Corporation. In open court, counsel for Fremont Valley Development Corporation stated that the corporation presently makes no claim to it, that the stock belongs to the plaintiffs herein, and that they can do with it as they please.

If these items of evidence lead to an inference that in the year 1961 the Fremont Valley Development Corporation thought that it was a debtor of the plaintiffs, this would not serve, after the event, to revive a money obligation with an incidental right to file mechanic's liens. The unambiguous stock transaction constituted payment in full of the debt owed the plaintiffs by Stevens and Smith, and no inferred agreement thereafter could revive a defunct obligation, that is to say the right to a payment in money and the incidental benefit of mechanic's liens.

The legal effect of the finding that the issuance of the certificate for 36,000 shares of stock ". . . was in violation of the permit issued by the Corporation Commissioner of the State of California, and, therefore, voidable in that it was upon an agreement assumed by the corporation to buy back said stock should the par value thereof drop below par" and that "the plaintiffs rescinded said issuance by the return of said stock to the corporation" is not supported by the evidence, in that (1) Messrs. Smith and Stevens and their partnership, and not the corporation, agreed to purchase it;

(2) if Fremont Valley Development Corporation afterwards sought to take over this obligation, it could not legally do so (Corp. Code, §§ 1705, 1706, 1707; Ballantine & Sterling, Cal. Corporation Laws (4th ed.) vol. 1, § 147, p. 298; *Tiedje* v. *Aluminum Taper Milling Co.*, 46 Cal.2d 450 [296 P.2d 554]), and (3) the Corporation Commissioner had not given his consent to the transfer of the stock, as provided in the permit.

The stock subscription and the other two writings of even date are so clear and unambiguous that there can be no additional evidence of any secret arrangement of the parties which can legally run counter to those clearly expressed agreements. (Civ. Code, § 1638; *Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128, 133 [48 P.2d 13]; *Barnhart Aircraft, Inc.* v. *Preston*, 212 Cal. 19, 23 [297 P. 20]; 1 Witkin, Summary of Cal. Law, Contracts, § 217, p. 247; 20 Am. Jur., Evidence, § 1143, p. 996.) The evidence with respect to the communications of the parties in the year following the issuance of the stock was improper as a basis for adjudication of their respective rights at the time of the stock subscription. (Code Civ. Proc., § 1856; *La Cava* v. *Breedlove*, 77 Cal.App.2d 129 [174 P.2d 880]; *Graddon* v. *Knight*, 99 Cal.App.2d 700 [222 P.2d 329]; *Frink* v. *Roe*, 70 Cal. 296; [11 P. 820]; *Da Rocha* v. *Corse*, 94 Cal.App. 335 [271 P. 208].)

Respondents rely upon the equitable rule permitting proof that a deed absolute on its face is in fact only a mortgage. But proof of the latter character in such an instance is expressly authorized by the Civil Code (Civ. Code, § 2925); it has long been recognized in the case of deeds, which are in fact mortgages, in jurisdictions throughout the country (33 Cal.Jur.2d, Mortgages, etc., § 21, pp. 437-439). The rule thus invoked is not applicable to writings such as those involved in the present suit.

The proof, without legitimate contradiction, shows that 36,000 shares of the stock of Fremont Valley Development Corporation were taken in full payment of the claims which the plaintiffs formerly had against the respondent subdividers; therefore, there was an accord and satisfaction (Civ. Code, §§ 1521-1524), the debt was paid in full, and as no sum was then due to the plaintiffs for their work they had no right to file mechanic's liens. This being dispositive of the case, it is unnecessary to discuss any other point raised by appellants.

It is ordered that the trial court direct the clerk to deliver to the plaintiffs herein the certificate of ownership of the

36,000 shares of the Fremont Valley Development Corporation, which is presently in his custody and which appellants have said belongs to plaintiffs and respondents.

The judgment is reversed with directions to the trial court to execute new findings of fact and conclusions of law and a judgment in conformity with the views expressed herein.

Brown (R. M.), J., concurred.

A petition for a rehearing was denied August 27, 1964, and respondents' petition for a hearing by the Supreme Court was denied September 24, 1964.