[Crim. No. 1491. Third Appellate District.—November 19, 1936.]

THE PEOPLE, Respondent, v. A. E. MURPHY et al., Appellants.

Dennett & Zion and Frank Cadmus Damrell for Appellants.

U. S. Webb, Attorney-General, and Wilmer W. Morse, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendants have appealed from judgments of conviction of the offenses of unlawfully selling shares of stock of a mining corporation without having procured a license therefor, contrary to the provisions of the Corporate Securities Act of California. (Stats. 1917, p. 673, and amendments; 2 Deering's Gen. Laws, p. 1924, Act 3814.) They have also appealed from the order denying their motion for a new trial.

It is contended the verdicts and judgments of conviction are not supported by the evidence; that the court was guilty of prejudicial misconduct, and that it erred in admitting evidence in the course of the trial and in giving to the jury certain instructions.

The evidence is conflicting, but the following statement of facts is adequately supported by the record. The defendants are husband and wife. During all of the time involved in this transaction they resided in Stanislaus County, California. They were neither miners nor mining experts, but were engaged solely as stock brokers. In 1927, Andrew Johnson and Stephen Gardella located and owned nine adja-

cent mining claims in Sierra County, California. Johnson and Gardella organized a California mining corporation under the name of Deadwood Mining Company, with 500,-000 shares of capital stock. They employed the defendants to market the stock of that company for the purpose of financing the enterprise. A. E. Murphy received a one-half interest in the corporation for his service. Pursuant to this employment the defendants went to San Francisco and sold stock without procuring a permit to do so from the corporation commissioner. October 9, 1928, Mr. Murphy was personally notified by a representative of the commissioner that he was violating the securities act in selling the stock without a permit, and he was directed to discontinue such sales. The defendants then visited the office of the corporation commissioner in Sacramento regarding their alleged violation of the law, and they were again warned not to sell other shares of stock of the corporation without first procuring a license as required by law. Following the advice of counsel, the defendants proceeded to organize a similar mining corporation in the state of Nevada. A. E. Murphy was elected president of the California corporation, and his wife was made secretary of that company. The Nevada corporation was organized under the same name of Deadwood Mining Company, with 250,000 shares of capital stock. A. E. Murphy as president and his wife as secretary conveyed by deed all of the property of the California corporation to the Nevada company. There was no other consideration than that transfer of title. Thirty-seven thousand shares of stock were issued by the Nevada corporation, without further consideration, to each of the following persons: A. E. Murphy, Andrew Johnson, Stephen Gardella and Mrs. Murphy. No other shares were issued in that corporation except a nominal block of 100 shares which was given to the daughter of Mrs. Murphy for the purpose of organization. By resolution duly adopted by the corporation, Mr. Murphy was constituted sole manager of the Nevada company. He and his wife subsequently purchased for a nominal consideration all of the other shares of the corporation except the 100 shares held by her daughter. Gardella died. His estate was paid $250 for his shares, and Johnson's interest was purchased for $1,000. The defendants thereby became sole owners and controllers of the Nevada corpora-

tion. They then proceeded to sell without license from the corporation commissioner some 20,000 shares of stock at a dollar per share to purchasers in Stanislaus County, California.

. It is true that much of the stock which was sold and transferred nominally stood in the name of either Mr. or Mrs. Murphy. Some of the Johnson and Gardella stock was cancelled and other stock in lieu thereof was issued directly to purchasers. It is also true that some of the money derived from the sales of stock was used for the personal benefit of the defendants to defray their own individual expenses, such as rent and maintenance. But it appears with some conflict of evidence, that purchasers of stock were told by the defendants at the times of the sales that the money was to be used to promote the interest of the mining corporation. There is evidence from which the jury was warranted in assuming that some of the money derived from the sales of stock was actually used to promote the interest of the corporation, such as payments for property and corporation taxes; the costs of quieting title to the mining claims; the settlement of certain demands against the property; the hiring of experts; the procuring of reports upon the prospect of a successful operation of the mines, and expenses incurred by the defendants in an eastern trip, which was taken for the purpose of selling 25,000 shares of the treasury stock of the company. It appears the entire activity of the defendants was devoted to marketing the stock of the corporation in the indirect method of purporting to issue the stock to themselves and then to sell it with the claim that it was their own individual *bona fide* stock. The mine was never actually developed or operated. The enterprise appears to have been conducted as a wildcat scheme to evade the law.

It is true the stock which was issued to Dr. E. A. Julien was transferred to him in payment of money formerly loaned to the defendants, a part of which money was used to promote the interest of the mining corporation as heretofore stated. Mr. Murphy attempted to sell him stock at the time when the money was borrowed, but the doctor refused to take it. He advanced to the defendants from time to time ten or fifteen thousand dollars. When he later concluded that the defendants were unable to repay his money, the doc-

tor consented to accept 12,500 shares of stock in payment of the debt.

The appellants contend that since this stock was transferred in payment of a previous debt, the sale was not in violation of the securities act, but, on the contrary, that the transaction falls within the exception announced in section 2 (c) of the act, which declares:

" . . . The provisions of this act shall not apply to the sale . . . by or for the account of a pledgee or mortgagee selling or offering for sale or delivery in the ordinary course of business, to liquidate a *bona fide* debt, a security pledged in good faith as security for such debt.''

The sale of stock to Dr. Julien does not come within the previously quoted section of the act. The exemption from the general provisions of the act, therein mentioned, applies only to a person who holds stock as a pledgee, and who sells the stock pursuant to the pledge for the purpose of satisfying a previous *bona fide* debt *for which the stock* was held as security. Dr. Julien never held that stock as security for the payment of his previous loan to the defendants. The stock was never pledged or hypothecated to anyone. The consideration for the stock was the money previously loaned to the defendants, a part of which was used to promote the interest of the corporation. It is immaterial that the stock was not sold for cash at hand. It was sold for a valuable consideration, in violation of the law just as effectively as though the issuing of the stock and the payment of the purchase price therefor were parts of the same transaction.

Under the circumstances of this case we are impelled to hold that the evidence adequately supports the verdicts and judgments to the effect that the defendants sold and transferred the stock in violation of the Corporate Securities Act; that they maintained the mining corporation, as sole owners and controllers thereof, and issued and sold stock therein as a part of a fraudulent plan ''for the direct or indirect promotion of a scheme and enterprise with the intent to violate and evade the act''; that since they were the sole owners of the enterprise which was fraudulently conducted to evade the law, the corporation may be deemed to be the *alter ego* of the defendants as nominal stockholders, and for the purposes of this act they may be considered to have been the ''issuers'' of the stock.

The purpose of the Corporate Securities Act is to protect the public from fraudulent sales of worthless and spurious securities. In view of the fact that the mining enterprise was never developed; that it had no ascertained value, but, on the contrary, appears to have been a pure wildcat speculation; that, after warning, the defendants procured control of the enterprise, and abandoned the California corporation to organize another company in Nevada, to which all the property of the first corporation was transferred, with the evident intent of circumventing and evading the California law; that the only consideration for which they originally became the holders of stock, was for services to be performed in violation of law, and that they subsequently acquired the Johnson and Gardella shares of stock for nominal consideration, we are driven to the conclusion that the entire plan consisted of a fraudulent scheme to evade the law and to unlawfully dispose of worthless stock contrary to the provisions of the securities act.

Under such circumstances the jury was justified in determining that the defendants were not the *bona fide* owners of the stock which they sold contrary to law; that they did not sell it for their own individual benefit, but, on the contrary, that it was sold, in part, to unlawfully promote the mining enterprise as a part of a fraudulent scheme to evade the law, and that since they owned and controlled the company, in contemplation of law they were the *alter ego* of the corporation and guilty of selling stock without a license, of which stock they became the issuers''.

Under such circumstances the law will assume that a separate and distinct entity between the corporation and the stockholders does not exist. (*Wenban Estate, Inc.*, v. *Hewlett*, 193 Cal. 675, 695 [227 Pac. 723] ; *Erkenbrecher* v. *Grant*, 187 Cal. 7, 11 [200 Pac. 641].) In the Hewlett case, *supra*, it is said in that regard:

''While it is the general rule that a corporation is an entity separate and distinct from its stockholders, with separate, distinct liabilities and obligations, nevertheless there is a well-recognized and firmly settled exception to this general rule, that, when necessary to redress fraud, protect the rights of third persons, or prevent a palpable injustice, the law and equity will intervene and cast aside the legal fiction of independent corporate existence, as distinguished

from those who hold and own the corporate capital stock, and deal with the corporation and stockholders as identical entities with identical duties and obligations.''

In accordance with the preceding statement of law and facts, it has been held that similar circumstances constitute unlawful sales of corporate shares or stock contrary to the inhibition of the securities act. It was the sole province of the jury to determine whether the defendants were the *bona fide* owners of the stock which they sold; whether it was sold exclusively for their own individual benefit, and whether the entire enterprise constituted a fraudulent scheme to evade the law.

In the case of *People* v. *Smith,* 111 Cal. App. 177 [295 Pac. 105], the defendant was convicted of the crime of selling the stock of a foreign corporation without a permit, in violation of the Corporate Securities Act. In consideration of a quitclaim deed to certain mining claims the corporation issued 350,000 shares of its stock to the defendant, who thereby became the manager and controller of the company. The defendant claimed, just as the defendants assert in this action, that he became the *bona fide* owner of the shares for a valuable consideration. Some of these shares were subsequently sold without a permit to innocent purchasers. The facts of the Smith case are quite similar to those of the present action. The court said:

''The jury was not compelled to believe his statement that he was the owner of the stock, but was entitled to consider the surrounding circumstances in determining whether he was in fact the owner, whether he was acting for himself or for the corporation, and whether the sales were made in a *bona fide* way or for the purpose of evading the act.

''The evidence shows that at the organization meeting of the corporation all of the stock in the company was transferred to appellant and that no one else owned any of the stock until he caused certain shares to be transferred to others in payment for the mining claims involved. At the time his proposition to exchange the mining claims for all of the stock of the corporation was acted upon, he owned all of the stock in the corporation and through dummy directors was dealing with himself. Whether or not he was the owner of the 350,000 shares of stock, he was, in fact the issuer thereof. The evidence is sufficient to show that the sales of stock de-

scribed in the information were not sales of securities by an owner who was not the issuer thereof; that such sales were not made in a *bona fide* manner by an owner for his own account alone; and that such sales were not entirely for his own account but in part for the account of the corporation, and made with the purpose of securing funds to sufficiently develop the property which had been transferred to the corporation to make such a showing as would enable the appellant to make further sales for his own profit. We think the evidence is sufficient to show that the entire proceeding was carried out by the appellant for the purpose of evading the provisions of the Corporate Securities Act. If the circumstances disclosed by this record do not show a deliberate intention to evade this act, it would be difficult to imagine a set of circumstances that would show such an intention. In our opinion, the evidence is entirely sufficient to support the verdict.''

In the case of *People* v. *Craven,* 219 Cal. 522 [27 Pac. (2d) 906], the defendant was convicted of selling shares in an oil and gas project without a permit, contrary to the Corporate Securities Act. The defendant owned an oil lease upon which he issued and sold shares in the proposed enterprise. The judgment of conviction was affirmed. The court expressly approved the declarations of law which were made in the Smith case, *supra.* It further said:

''There would have been no practical difference in so far as the transaction might affect the public had the defendant formed a corporation, sold to it his leases in exchange for its stock, and then sold this stock without securing a permit. This was the course followed by the defendant in *People* v. *Smith,* 111 Cal. App. 177 [295 Pac. 105], which was held to be a direct violation of the penal provisions of the Corporate Securities Act.''

In the present case the facts are less favorable to the defendants than they were in the Smith case. In the Smith case, the defendant conveyed to the corporation mining claims in consideration for which he received the certificate of stock which he subsequently sold without a permit. In the present case the defendants paid nothing of value for their stock. It was issued to them in consideration of services to be performed in unlawfully marketing the stock of the corporation, which they proceeded to do without procuring a permit therefor.

In truth, they evidently attempted to evade the law by fraudulent and circuitous methods. We are satisfied these sales constituted a violation of the securities act.

■ We are of the opinion the court did not err in charging the jury that:

"You are instructed that in this case, although there must exist a criminal intent in the defendant, the specific intent with which the alleged act was done is in this case immaterial, it being sufficient to show that the offense was done wilfully. It is presumed that a person intends the natural consequences of an unlawful act, and therefore if the wilful commission of the act is shown, the criminal intent is necessarily established."

The jury was elsewhere charged that it was necessary for the prosecution to prove the intent with which the act was performed. Immediately preceding the challenged instruction above quoted, the court said to the jury:

"You are instructed that the intent with which the unlawful act here charged was done, *must be proved*, as well as the other material facts in the information, and in arriving at your decision on the question of the intent of the defendant, you are at liberty to consider all the circumstances connected with the offense charged."

The specific intent with which securities are sold without a license is not made a necessary element of the crime of violating the Corporate Securities Act. It has been so held. (*People* v. *McCalla,* 63 Cal. App. 783, 794 [220 Pac. 436]; *People* v. *Eiseman,* 78 Cal. App. 223, 246 [248 Pac. 716]; *People* v. *Stewart,* 115 Cal. App. 681, 687 [2 Pac. (2d) 195]; 8 Cal. Jur. 328, sec. 376; sec. 7, subd. 1, Pen. Code; sec. 21, Pen. Code.) ■ Unless the intent with which an act is done is specifically made a necessary element of the crime by the terms of the statute, it is not necessary to allege or prove that the act is performed with the intent of violating the law. On the contrary, when intent is not specifically made a necessary element of the crime, the intent to violate the law will be presumed from proof of the unlawful act. (*People* v. *Harris,* 29 Cal. 678; *People* v. *Stennett,* 51 Cal. App. 370, 387 [197 Pac. 372].) Section 7, subdivision 1, of the Penal Code provides in part that: "It does not require any intent to violate law." And section 21 of the same code provides that: "The intent or intention is manifested

by the circumstances connected with the offense, and the sound mind and discretion of the accused."

The Corporate Securities Act does not make the intent with which the unlawful sale of securities without a license is procured an essential element of the crime. Section 3 of that act defines the offense. The intent with which such sales are made is not even mentioned in that section. It provides in part:

"No company shall sell any security, except upon a sale for a delinquent assessment against such security made in accordance with the laws of this state, or offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do."

It is true that section 2 of that act, which primarily seeks to define particular words and terms of the act, does contain certain specified exceptions to which it is declared the act does not apply. These exceptions are not affirmative matters necessary to constitute the crime. They contain mere negative circumstances which are deemed to constitute a lawful sale of securities as distinguished from the unlawful sale of stock which is prohibited by the statute. These exceptions are matters of defense to a charge of unlawful sale of stock, which defenses may be made by the accused. That portion of section 2 provides as follows:

"(c) Except as hereinafter expressly provided, the provisions of this act shall not apply to the sale of any security in any of the following transactions: . . .

"3. The sale of securities when made by or on behalf of a vendor not the issuer or underwriter thereof who, being a *bona fide* owner of such securities, disposes of his own property for his own account, and such sale is not made, directly or indirectly, for the benefit of the issuer or an underwriter of such security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any portion of this act."

It is true that after charging in the language of the statute that the defendants did "knowingly, wilfully and unlawfully sell" a specified number of shares in the Deadwood Mining Company to designated persons, without first obtaining a permit therefor from the corporation commissioner of the state of California, the information does further allege

in a separate paragraph in negative language to that employed in the preceding subdivision (c) 3, of the exceptions to the act above quoted, to the effect that the defendants "did issue and sell said shares . . . for the direct or indirect promotion of a scheme or enterprise to finance the operations of said corporation, *with the intent of violating* and evading the provisions of said Securities Act, particularly the provisions of paragraph 3, subdivision C, section 2 of the Corporate Securities Act".

It was not necessary that the information should negative or state the matters contained in the foregoing exception to the provisions of the act. That paragraph of the act merely declares certain negative circumstances which are not deemed to come within the inhibitions of the securities act. █ To sustain a conviction of unlawfully selling stock without a permit, it was not necessary to allege or prove the negative circumstances enumerated in section 2 (c) 3 of the act, which constitute mere exceptions to the inhibitions of the law. Those were matters of defense. (*People* v. *Main,* 75 Cal. App. 471 [242 Pac. 1078]; *People* v. *H. Jevne Co.,* 179 Cal. 621 [178 Pac. 517, 519]; 14 Cal. Jur. 52, sec. 39.) In the case last cited, the well-established rule with respect to alleging in an information or indictment, negative matter which exempts one from responsibility of a statutory offense, it is concisely said, in quoting with approval from *Ex parte Hornef,* 154 Cal. 355 [97 Pac. 891], that:

" 'Such exceptions and provisions are to be negatived in the pleading only *where they are descriptive of the offense or define it,* and where they afford matter of excuse merely, they are to be relied on in defense.' "

Since the negative matter contained in the exception to the offense of unlawfully selling stock without a permit is not an essential part of the prohibited crime, it was not necessary that those circumstances should be alleged in the information or proved. It was merely a matter of defense. It follows that it was not necessary to affirmatively prove that the act was intentionally violated. The court therefore correctly instructed the jury, in effect, that it was not necessary for the prosecution to affirmatively prove that the defendants intended by their acts to violate the securities act but that proof of unlawful conduct in contravention of the act would raise the presumption of the intent to evade the

law. The other instructions upon that subject may be reconciled with the preceding principle of law, but if they be deemed to conflict with it, they were favorable to the defendants. They were not prejudicial and the defendants may therefore not complain of the giving of these instructions.

The jury was properly instructed that evidence of other sales of stock by the defendants was competent to show the intent, motive, system or scheme with which they operated the enterprise to evade the securities act.

We have carefully examined each of the other alleged erroneous instructions which were given to the jury, and are of the opinion they were properly stated. They cover various elements of the offenses charged, and are warranted by the fact that each appears to have been based on competent evidence which was adduced. The court did not err in giving these instructions.

It is contended the judge of the court was guilty of prejudicial misconduct in the remarks which he addressed to counsel for the defendants in the course of the trial. We have examined the record with reference to these challenged remarks and find no misconduct in any of them. It is not only the privilege, but it is the duty of a judge to see that trials of cases are conducted in an orderly and respectful manner. A lack of courtesy and respect toward the court and toward witnesses breeds contempt for our system of jurisprudence. It is the duty of a trial judge to see that all witnesses are treated with due consideration. It has frequently been said a judge should not permit counsel to intimidate witnesses. So far as we are able to see, there was nothing in the conduct or statements of the judge which transgresses his province and duty in that regard. The circumstance which led to the chief charge of error occurred when the prosecuting witness, Dr. Julien, was being cross-examined by counsel for the defendant. In an excess of zeal the attorney said, interrupting the witness when he was making an apparently legitimate explanation:

"Just a moment, just answer the question and you can explain it, *the court is taking good care of you.*"

This statement of counsel was improper. It implies that the court was unduly favoring and protecting the witness. There is no evidence of such conduct on the part of the court. The defendant, therefore, may not complain of the

criticism and warning of the court as the result thereof. (*People* v. *Mahach,* 65 Cal. App. 359, 377 [224 Pac. 130].)

■ The court did not err in striking from the evidence certain letters which were received as a part of a report rendered to the corporation commissioner. These letters constituted hearsay evidence, and were improperly admitted. The report was received over the objection of the defendant. It does not appear that these letters were called to the attention of the court at the time the report was offered. The letters were never read to nor in the presence of the jury. The contents of these letters were not made known to the jury. On motion of the district attorney they were subsequently withdrawn and stricken from the record. Under the circumstanecs of this case it may not be said the reception of these letters was prejudicial to the defendants.

■ The court did not err in limiting the arguments to the jury by respective counsel to one hour and a quarter. The limitation of the arguments of counsel, within a reasonable duration of time, is usually within the discretion of the court. (24 Cal. Jur. 741, sec. 25.) The record in this case indicates that the attorney for the defendants consented to that limitation of time. It does not appear the defendants were prejudiced thereby.

The articles of incorporation of the Deadwood Mining Company of Nevada were properly admitted in evidence. The defendants were charged with unlawfully violating the provisions of the Corporate Securities Act by selling the stock without securing permission therefor. Each count of the information specifically charges them with wilfully and unlawfully selling designated shares of stock "in the Deadwood Mining Company, a corporation . . . without first obtaining a permit . . ." The information then charges that the defendants so sold this stock with the *"felonious intent to violate the said Corporate Securities Act";* that the defendants sold the stock "as vendors and *not as bona fide owners";* that such sales were made "directly or indirectly *for the benefit of the . . . Deadwood Mining Company, . . . and for the direct or indirect promotion of a scheme or enterprise to finance the operations of said corporation, with intent of violating and evading the provisions of said Securities Act,* particularly the provisions of paragraph 3, subdivision C, section 2, of the Corporate Securities Act.

. . . '' The defendants failed to demur to this information. The information certainly states a public offense. We think its allegations are certain and definite. If it be deemed to be uncertain in any respect, the defendants have waived such uncertainties by failure to demur to the information or to move in arrest of judgment. Such objections may not be raised for the first time on appeal. (*People* v. *Stone,* 199 Cal. 610 [250 Pac. 659] ; 8 Cal. Jur. 499, sec. 515).

 The articles of incorporation constituted competent evidence. The essential proof of a charge that one has violated the securities act by selling corporation stock without a license is to show that the corporation exists. The articles are the best evidence of that fact. Moreover, to rebut the defendants' claim, under the exemption of liability mentioned in section 2 (c), subdivision 3, of the act, it was competent to prove the stock which was sold was not the individual stock of the defendants, but, on the contrary, that it was their "issue" of the corporation stock on the theory of an *alter ego* relationship to the corporation itself; that it was sold partly for the benefit of the corporation and not for their exclusive individual benefit, and that the entire plan of the defendants, of which the sale of the stock was a part, was for the "promotion of a scheme or enterprise to finance the operations of said corporation, with the intent of violating and evading" the provisions of the act. For any of the foregoing purposes the articles of incorporation of the mining company in question were competent. The court did not err in admitting them in evidence.

For the purpose of showing that no license to sell stock was issued to the defendants by the corporation commissioner, an unverified file of proceedings in that matter was received in evidence over the objection of the defendants. This record contained several letters or communications to the corporation commissioner by his agents. These letters were never read to the jury. Their contents were not made known to the jury. They were subsequently withdrawn on motion of the district attorney. The fact that they were included in the file as it was originally received in evidence is therefore harmless. The letters could not have prejudiced the defendants. The balance of that record, which did remain in evidence is merely cumulative of com-

petent evidence adduced at the trial, of witnesses who were subsequently sworn and examined at length. ▇ That record consists merely of a copy of the written notice which was served on the defendants by the commissioner demanding that they cease to sell stock, together with two or three memoranda of reports taken from its files, which were made to the commissioner by his agents, Messrs. Crase and Solomon. This report from the files was offered under the provisions of section 31 of the Corporate Securities Act, which provides that all duly verified copies of reports made by the corporation commissioner, or his officers or employees, ''shall be *prima facie* evidence of the facts therein stated.'' This record was hearsay evidence, and improperly received. It was not verified as the statute requires. Moreover, it is in direct conflict with the mandate of section 686, subdivision 3, of the Penal Code, which provides that a person who is accused of crime is entitled, with certain exceptions, to be confronted by the witnesses against him. These unverified statements were hearsay and incompetent. (*Englebretson* v. *Industrial Acc. Com.*, 170 Cal. 793 [151 Pac. 421].) But they were harmless for the reason that each witness who furnished these statements to the commissioner and the individual who served the notice for the defendants to cease selling stock was subsequently called and thoroughly examined and cross-examined upon every material statement contained in the reports and in the notice. The portion of this record which remains in evidence was fully covered in every particular by the testimony of witnesses by whom the defendants were actually confronted. The challenged record of the commissioner's files was therefore merely cumulative and harmless. The defendants were not prejudiced thereby.

▇ The court did not err in receiving testimony over the defendants' objection that they paid no money for the shares of stock which were issued to them. This evidence was competent as tending to show that the defendants were not the *bona fide* owners of the stock which they sold without a permit. It was also competent for the purpose of showing that the corporation and the individual defendants were the same entity, and that the organization of the mining corporation and the sales of stock were a part of a fraudulent scheme to evade the Corporate Securities Act.

We find no reversible error in receiving or rejecting testimony in the course of the trial.

In a final brief which the defendants were permitted to file after the cause was orally argued, for the first time they have challenged subdivision 3 of section 2 (c) of the securities act as unconstitutional. In support of that contention, they rely on *People* v. *Pace*, 73 Cal. App. 548, wherein it is said, at page 564 [238 Pac. 1089, 1096] :

"We are of the opinion that the section of the Corporate Securities Act under consideration, so far as it attempts to require a natural person to secure a broker's permit as provided in said act before he may lawfully sell his own securities, where he is not the issuer or underwriter of the same, is unconstitutional and invalid for the reasons herein set forth."

Since the opinion was rendered in the Pace case, *supra*, subdivision 3 of section 2 (c) was amended with the evident purpose of meeting the objections announced in that decision. (Stats. 1931, p. 938.) In the Pace case the securities in question were the *bona fide* property of the defendant and he sold them for his own personal benefit. In the later case of *People* v. *Craven*, 219 Cal. 522 [27 Pac. (2d) 906], the same attack upon the alleged unconstitutionality of the act was made which is here urged. The Supreme Court specifically refers to the Pace case and limits the application thereof in the following language:

"It is true that the court . . . had much to say regarding the constitutionality of an act which would require a *bona fide* owner of securities to secure a broker's license before he could legally sell the same, but, in our opinion, *what was said by the court in that regard was not necessary to the decision . . . nor was it applicable to the facts then before the court.*"

And then in support of the constitutionality of the securities act the court further said in the Craven case:

"On the other hand, there are decisions in this state directly in point which sustain the provisions of the Corporate Securities Act requiring an owner *who is also an issuer of securities* to secure a permit from the corporation commissioner before he can legally sell or negotiate the sale of such securities. We refer to the following decisions of the District Court of Appeal: *People* v. *Smith*, 111 Cal. App. 177

[295 Pac. 105]; *Black* v. *Solano Co.*, 114 Cal. App. 170, [299 Pac. 843]; *People* v. *Shafer*, 130 Cal. App. 74 [19 Pac. (2d) 861], and *People* v. *Claggett*, 130 Cal. App. 141 [19 Pac. (2d) 805]. . . . We are in perfect accord with the conclusion reached therein, and, in our opinion, the principles so announced should control the decision of the present case."

The challenged subdivision of the act makes it clear that the inhibition of selling securities without a license does not apply to *a bona fide owner of stock, who sells his own property for his personal benefit.* The section in question provides that the act does not apply to a *bona fide* owner of stock when he is not himself the issuer of the security and when it is not sold for the benefit of some other person, to wit, "for the benefit of the issuer", and when it is not sold to promote a fraudulent scheme or enterprise with the intention of evading the law. In accordance with the exceptions last mentioned it may not be said under such circumstances the owner is selling the stock *for his own benefit,* but, on the contrary, the sale then becomes an invasion of the spirit of the act, which is to protect the public against fraudulent sales of spurious and worthless wildcat securities. We are of the opinion the challenged portion of the act is constitutional.

The judgments and the order are affirmed.

Plummer, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 4, 1936, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 17, 1936. Langdon, J., did not participate.