CARROLL J. BELLIS AND MILDRED BELLIS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6873–70. Filed December 18, 1973.

*Leonard B. Hankins*, for the petitioners.
*Richard H. Gannon*, for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency of $36,052 in the income tax of petitioners for 1968. The deficiency stems solely from respondent's disallowance of a theft loss claimed by petitioners.

### FINDINGS OF FACT

Some of the facts have been stipulated and they are so found.

Petitioners are Carroll J. Bellis and Mildred Bellis, husband and wife, who at all relevant times have resided in Rolling Hills, Calif. Hereafter petitioner shall refer solely to Carroll J. Bellis.

Petitioner is a surgeon who has practiced his profession in Long Beach, Calif., since 1945. At the time of trial he was 63 years old.

The New Pioneer Club, Inc. (New Pioneer), was a corporation organized prior to April 27, 1966, under the laws of the State of Nevada, and on April 27, 1966, was in existence and doing business in Las Vegas, Nev. It was engaged in a hotel, casino, bar, restaurant, and parking lot business.

Norbert Jansen (Jansen) was president of the New Pioneer Club, Inc., from sometime prior to April 27, 1966, until after August 15, 1967.

On or before April 27, 1966, the petitioner orally agreed to purchase 18.18 shares of New Pioneer Club, Inc., for the sum of $52,000. This amount, in the form of a cashier's check, was delivered to Jansen and Frank Schivo (Schivo) by petitioner on April 27, 1966, at Long Beach, Calif.

At the time the check was delivered Schivo was a former patient of petitioner and Jansen had been his patient since December 1965.

At no time did New Pioneer ever make application for or obtain a permit from the corporation commissioner of the State of California to negotiate for or sell stock to residents of the State of California.

At no time did New Pioneer ever file an application for or obtain or qualify the corporation to issue stock with the Securities and Exchange Commission of the United States.

Petitioners were never told that the corporation's stock was unregistered under Federal law or that a permit to sell the stock had not been obtained from the California Corporation Commission.

At the time they purchased their stock in New Pioneer petitioners had little or no investment experience; they did not seek legal or investment advice until January 1968; they had no knowledge of stock registration requirements imposed by Federal or State law.

Petitioner met Jansen while treating him as his medical patient. Their only discussion concerning petitioners' possible purchase of stock took place during December 1965 or January 1966. During this discussion Jansen stated that New Pioneer "was doing a good business" and he offered to sell the petitioners some of its stock. This was their last conversation until the date Jansen accepted delivery of the purchase price.

Between the date of his first conversation with Jansen and the date Jansen accepted delivery of the purchase money, petitioner received two or three telephone calls from Schivo. During these conversations petitioner was urged to purchase some of the corporation's stock pursuant to Jansen's original offer.

Petitioners became anxious when they did not receive their stock certificates after they paid the $52,000 to Jansen on April 27, 1966.

After contacting Jansen to inquire why they had not received their stock certificate, petitioner received a letter from Jansen, sent to him on or about June 1, 1967, stating that the corporation was prohibited by law from sending the stock certificate by mail and that the petitioners could pick up their certificate in Las Vegas. Petitioners' son, Joseph Bellis, who was a resident of Las Vegas, eventually picked up the stock certificate and delivered it to petitioner during a trip to his parents' home.

Sometime after petitioner received his stock certificate, and prior to January 1968, petitioner made a trip to Las Vegas to request that the $52,000 be returned. During this trip petitioner contacted both Jansen and Schivo and made his request. Schivo told petitioner that things "were going very poorly" in downtown Las Vegas.

In January 1968 petitioner contacted an attorney with a view to recovering his and his wife's investment. He was advised that recovery would be difficult and costly. In April 1968 petitioner was told that the corporation had filed a petition in bankruptcy in August 1967 and, because the United States Government had priority, it would be unprofitable to pursue his claim.

#### OPINION

Petitioner is a surgeon in Long Beach, Calif. In late 1965 and early 1966 petitioner discussed the possibility of his investing in a casino in Las Vegas with Jansen whom he was treating at that time. Jansen

was the president of New Pioneer which ran a casino and related businesses in Las Vegas. Jansen told petitioner that New Pioneer "was doing a good business." As a result of his discussion with Jansen and of two or three hortatory phone calls from Schivo, a former patient of petitioner with Las Vegas connections, petitioner decided to invest $52,000 in order to buy a 4-percent stock interest in New Pioneer.

Petitioner paid Jansen the $52,000 by cashier's check in April 1966 but did not receive his stock at that time. It later developed that Jansen would not send petitioner his stock certificate by mail because the stock was not registered for sale by the Securities and Exchange Commission or by the California Corporation Commission; however, petitioner's son, who lived in Las Vegas, was able to obtain the stock certificate for petitioner. When it appeared that he was not going to profit from his investment in late 1967, petitioner went to Las Vegas to try to obtain the return of his money. He was rebuffed by Jansen and Schivo.

In early 1968 petitioner hired an attorney to investigate for him. The attorney informed him that New Pioneer had been having financial problems and that it had filed a petition in bankruptcy. The attorney advised petitioner that there was little likelihood that he could obtain any recovery from New Pioneer or Jansen.

Petitioner deducted the $52,000 as a theft loss on his 1968 return. Respondent determined that petitioner merely suffered a loss on a capital transaction and that no theft occurred. Petitioner offers two theories to support his claimed theft loss. The first is that "the sale of stock without a permit where one is required is misrepresentation, actionable fraud, and is theft under * * * section 165"; [1] and the second is that Jansen's misrepresentations as to the financial condition of New Pioneer amount to the crime of taking money by fraud or under false pretenses. Neither theory has any merit.

Petitioner's first argument is a misapplication and melange of two distinct legal theories. In California a person may violate the criminal sanctions of section 26104, California Corporation Code, against selling a security without a permit even though he has no specific intent to commit a crime. *People v. Murphy*, 17 Cal. App. 2d 575, 62 P. 2d 592 (1936). In addition, the person who sells a security without a permit is also subject to a civil action by the purchaser of the security on a strict liability basis. In *Mary Pickford Co. v. Bayly Bros.*, 12 Cal. 2d 501, 86 P. 2d 102 (1939), the Supreme Court of California stated that the seller of a security makes an implied representation that he has the proper permit to sell such security. Accordingly, when the seller does not have a permit, he is subject to an action for misrepresentation or fraud even though he may not

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

have actually known that obtaining a permit was necessary. Although petitioner's logic is a bit hard to explain, we believe that he has in some way added together all of the above rules to come up with the proposition that Jansen's sale of the stock of New Pioneer without obtaining a permit was in itself criminal fraud which can be shown even if there is no evidence of Jansen's guilty knowledge or intent.

We have defined theft as used in section 165 as "a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." *Perry A. Nichols*, 43 T.C. 842, 884 (1965), quoting *Edwards* v. *Bromberg*, 232 F. 2d 107, 110 (C.A. 5, 1956). Under this broad definition we have allowed a theft loss deduction where the taxpayer has suffered a loss as a result of a false representation of another person, *Perry A. Nichols, supra; Evelyn Nell Norton*, 40 T.C. 500 (1963), affd. 333 F. 2d 1005 (C.A. 9, 1964); *Michele Monteleone*, 34 T.C. 688 (1960); however, we have never permitted a deduction where the false representation was never in fact made but merely implied by law.

Selling stock without a permit may be a criminal act in California, and such act may also subject the seller to a civil suit for damages in the nature of a fraud action; but petitioner cannot bootstrap the simple selling of stock without a permit into criminal fraud. The California sanctions against selling stock without a permit apply strictly to every such seller whether he merely makes an honest mistake or is engaged in a malignantly fraudulent scheme. Accordingly, merely showing that Jansen violated California securities laws is not sufficient to prove that Jansen obtained petitioner's money for his own use or through any form of guile. Without evidence of guilty knowledge or intent on Jansen's part petitioner does not reach the threshold point of our broad definition of theft.

As his second argument petitioner contends that Jansen in fact fraudulently misrepresented the financial condition of New Pioneer and that Jansen's misrepresentation brought about his loss. According to petitioner Jansen told him that New Pioneer "was doing a good business" and that it needed additional capital to pay for expansion. As far as we can tell from the record, there was nothing untrue about Jansen's statements.

In 1965 New Pioneer began having cash flow problems after it purchased a hotel and began refurbishing it; however, it did operate in the black during several monthly periods. For its taxable year ended March 31, 1966, New Pioneer reported on a return filed on May 27, 1966, a net operating loss of about $170,000 on sales of about $5 million. In view of these facts we do not think that Jansen was neces-

sarily lying when he described New Pioneer's financial picture to petitioner in January 1966. New Pioneer was doing a substantial amount of business, and its losses were not so large as to make it improbable for Jansen to feel that it was making money. There is also nothing in the record which would indicate that Jansen should have had knowledge in early 1966 of the facts which eventually led to New Pioneer's filing a petition in bankruptcy over a year later.

We sympathize with petitioner and appreciate his suspicions of Jansen's forthrightness, but the record in this case does not support a finding that petitioner's loss was sustained as a result of a false or fraudulent misrepresentation by Jansen. Accordingly, we hold that petitioner did not sustain a theft loss under section 165(c) as a result of his purchase of the stock of New Pioneer.

*Decision will be entered for the respondent.*