Filed 6/24/13  Integrated Enterprises v. Kang CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| INTEGRATED ENTERPRISES, INC., | |
| Plaintiff and Respondent, | G046745 |
| v. | (Super. Ct. No. 30-2011-00453100) |
| YING KANG, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Franz E. Miller, Judge.  Affirmed in part, reversed in part, and remanded.

Rogers, MacLeith & Stolp and Douglas R. MacLeith for Defendant and Appellant.

Law Offices of Jessica Rachelle Blair and Jessica R. Blair for Plaintiff and Respondent.

\*          \*          \*

Contractor Integrated Enterprises, Inc., doing business as Integrated Artisan Builders, sued restaurant franchise owner Ying Kang (Kang), for damages incurred due to breach of contract and Kang cross-complained. The court awarded damages to Integrated Enterprises, Inc. and nothing to Kang. On appeal, Kang claims Integrated Enterprises, Inc. was entitled to nothing because it was unlicensed during the performance of the contract, the court erred in admitting into evidence an exhibit itemizing Integrated Enterprises, Inc.'s estimated damages, and the evidence did not support the damages award in any event.

Substantial evidence supports the trial court's findings that the party who contracted with Kang was sole proprietor Paul Yakel (Yakel), doing business as Integrated Artisan Builders, and that Yakel was properly licensed at all times from the date of contract to the date of termination of contract. Yakel's undisputed testimony shows that Integrated Enterprises, Inc. assumed the contract between Integrated Artisan Builders and Kang, and Kang has failed to show that Integrated Enterprises, Inc., having assumed that contract, cannot enforce it. We hold that to the extent of any error in the admission of the exhibit into evidence, the error was harmless error. However, we also hold that the trial court erred in awarding to Integrated Enterprises, Inc. an amount of damages exceeding the benefit of the bargain. Consequently, we affirm in part, reverse in part, and remand.

I

FACTS

In October 2010, H-Salt—Ying Kang entered into a contract with Integrated Artisan Builders for the design of tenant improvements on restaurant premises. The total amount paid for the work was more than $4,500.

On November 16, 2010, H-Salt—Ying Kang and Integrated Artisan Builders entered into a contract for the construction of the tenant improvements. Kang

signed as owner of the H-Salt franchise and Yakel signed as owner of Integrated Artisan Builders. The cost of the construction work was $65,000.

After the construction contract was signed, Kang asked for a number of changes to the design and equipment. Yakel prepared change orders to accommodate Kang's requests. The total cost of three change orders dated November 24, 2010 was approximately $27,000.

Although Yakel prepared the change orders on November 24, 2010 and explained to Kang that he could not move forward on the project until she signed and returned the change orders, she was slow to return them. He sent various e-mails to Kang and her business associate, Bruce Beckman (Beckman), trying to impress upon them the necessity of returning the change orders quickly so he could get started on the work. Getting the change orders signed was a slow process because Kang and Beckman wanted to pick some of the vendors or subcontractors themselves and Kang kept making changes to what equipment she wanted to use. Yakel could not complete the engineering work and plan preparation until Kang decided about the equipment.

In early December 2010, Beckman contacted Yakel about involving an attorney, who wanted to make some changes to the existing construction contract. A proposed addendum was forwarded to Yakel on December 8, 2010. Among other things, that addendum would have added a completion date of January 31, 2011. Yakel testified that he did not sign the addendum because he could not commit to a completion date when he could not get answers to questions necessary to proceed. Kang did not return the signed change orders to Yakel until December 9, 2010.

As of December 16, 2010, Kang and Beckman were still sending Yakel e-mails about changing equipment and plans. Yakel finally wrote, "You are killing me slowly with changes."

A letter from Attorney Douglas MacLeith, dated December 17, 2010, informed Yakel that Kang was in an awkward position because her existing lease was

3

expiring and she needed to be able to relocate her business as soon as possible. He stated that Kang had a right to terminate the contract and that she was seeking replacement contractors.

Nonetheless, as of December 20, 2010, Kang was still e-mailing Yakel about further changes. Late that afternoon, Yakel informed Kang and Beckman that he had incorporated all the new items into the blueprints and he would be submitting them to the City of Orange and the county health department the following day. He had spent about 60 hours preparing the plans. The plans were received by the county health department no later than December 22, 2010. On December 28, 2010, Yakel informed Kang and Beckman that the city was closed for the week and only limited work could be done on the site without the authorizations from the city and the health department. Two days later, Kang replied that she was tired of Yakel's delays, was looking for another contractor, and was going to complain about Yakel to the Contractors State License Board.

Kang terminated Yakel on about January 6, 2011. She and Beckman began working with another contractor, Alfredo Rodriguez, in December 2010 or January 2011. However, Kang did not sign an agreement with Rodriguez's company, AED Contractors, until April 4, 2011. The contract price was $85,000. However, Kang ultimately paid about $143,000 for the project. She opened her restaurant in July 2011.

Integrated Enterprises, Inc., doing business as Integrated Artisan Builders, filed a complaint against Kang for, inter alia, breach of contract. Kang filed a cross-complaint against Integrated Enterprises, Inc. for breach of contract and reimbursement of funds paid to an unlicensed contractor. The court awarded Integrated Enterprises, Inc. damages in the amount of $20,498.28 and costs in the amount of $2,737.11, for a total award of $23,235.39, and ordered that Kang take nothing. Kang appeals.

4

II

DISCUSSION

A. *Unlicensed Contractor:*

*(1) Business and Professions Code section 7031—*

Business and Professions Code section 7031, subdivision (a) provides: "Except as provided in subdivision (e), no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person . . . ."

Kang asserts that Integrated Enterprises, Inc. is not entitled to recover any monies under the contract because it was unlicensed at all times that work was performed under the contract. We disagree, for reasons we shall show.

*(2) Evidence—*

The November 16, 2010 construction contract described Integrated Artisan Builders as a licensed corporation. However, when the contract was signed, Yakel was actually a licensed contractor doing business as Integrated Artisan Builders, a sole proprietorship. He signed as "owner" of Integrated Artisan Builders.

Yakel had formed a new corporation, Integrated Enterprises, Inc., in about June 2010 and had submitted paperwork to the Contractors State License Board in August or September 2010 to transfer his license to the new corporation, which would then do business as Integrated Artisan Builders. Yakel believed it would take three or four weeks from the date of submission to transfer the license, so he drafted the construction contract to reflect that Integrated Artisan Builders was a corporation.

5

After he had prepared the contract, however, he realized that the license had not yet been transferred to the new corporation. So, he sent Kang an explanatory notice stating that, notwithstanding the fact the contract identified the contractor as a corporation, Integrated Artisan Builders was then still a sole proprietorship. He explained that Integrated Artisan Builders was in the process of being "consumed" by Integrated Enterprises, Inc., and that the contractor's license would be transferred to the new corporate entity.

Yakel's license was reassigned to Integrated Enterprises Inc. doing business as Integrated Artisan Builders on January 6, 2011. Yakel, as responsible managing officer of Integrated Enterprises, Inc., then executed a claim of lien for monies owing.

Yakel filed his complaint in the name of Integrated Enterprises, Inc., doing business as Integrated Artisan builders. At trial, Yakel acknowledged that the work actually had been performed by Integrated Artisan Builders as a sole proprietorship, before the license was transferred to Integrated Enterprises, Inc. He also testified that he filed a complaint in the name of Integrated Enterprises, Inc., rather than in the name of the sole proprietorship, "because the corporation inherited everything, the license number, the name, everything as totally seamless . . . ."

At the conclusion of trial, the court stated: "Mr. Yakel, if you look at both of these contracts, never purports to enter into an agreement on behalf of the corporation even though the corporation was in existence at the time. He signed as owner, Integrated Artisans—in that Integrated Artisan Builders was effectively a dba of his sole proprietorship. [¶] . . . The evidence is unrebutted that he was licensed at all times during the time he entered into the contract up till the time that he was terminated . . . . The court further found: "The contracting party in this case was Mr. Yakel . . . . The issue in this case is can Integrated Enterprises, Inc., sue and recover under the contract. And the unrebutted testimony . . . was that Integrated essentially assumed all the . . . assets of the sole proprietorship, and, therefore, assumed this particular contract."

6

Substantial evidence, as discussed above, supports these findings. Kang disagrees. In presenting her argument, she first draws our attention to several paragraphs of the complaint.

Paragraph 1 of the complaint provides: "Plaintiff INTEGRATED ENTERPRISES, INC. dba INTEGRATED ARTISAN BUILDERS ('Integrated Artisan Builders') is a California corporation in active status . . . . Plaintiff is, and at all times relevant to this action was[,] engaged in the business of design and construction, and is licensed under license number 688841 by the State of California to perform work as described in this complaint."

Paragraphs 18 through 20 of the complaint read as follows: "18. On or about November 16, 2010, Plaintiff Integrated Artisan Builders and defendants H-Salt and Ying Kang entered into a written agreement ('Written Contract') . . . whereby Plaintiff Integrated Artisan builders agreed to perform design and construction work for the benefit of defendants H-Salt and Ying Kang. [¶] 19. Plaintiff Integrated Artisan Builders performed design and construction work for the benefit of defendants H-Salt and Ying Kang until defendants H-Salt and Ying Kang instructed Plaintiff Integrated Artisan Builders to cease work on or about January 6, 2011. [¶] 20. Therefore, Plaintiff Integrated Artisan Builders performed all conditions, covenants and promises required by it to be performed in accordance with the terms and conditions of the Written Contract until on or about January 6, 2011."

According to Kang, by the wording of the complaint, Integrated Enterprises, Inc. admits that it was the one who, doing business as Integrated Artisan Builders, entered into the construction contract with her on November 16, 2010 and performed all work under the contract up until the date of termination. Because Integrated Enterprises, Inc. was not in fact licensed as represented, she argues, it is barred from collecting monies under the contract.

7

Kang also draws our attention to the fact that the February 1, 2011 claim of lien was in the name of Integrated Enterprises, Inc., doing business as Integrated Artisan Builders and was signed by Yakel, as responsible managing officer of Integrated Enterprises, Inc. She also cites certain of Yakel's somewhat contradictory testimony. He admitted that he when he prepared the contract he described Integrated Artisan Builders as a corporation because he thought the corporation would be entering into the contract. However, when he realized that he had made a mistake in prematurely describing the entity as a corporation, he sent out a notice dated November 13, 2010 captioned "General memorandum, contract modification," wherein he disclosed that Integrated Artisan Builders was still a sole proprietorship, although it was "in the process of being 'consumed' by corporate entity Integrated Enterprises, [I]nc." Yakel admitted that when he came to realize he had made a mistake in preparing the contract, he sent a notice to that effect to Kang, but did not seek to revise the contract document. He explained that he thought the notice he sent out took care of any questions and he had confirmed it with Kang in a telephone conversation. He ultimately signed the contract as "owner" of Integrated Artisan Builders and at trial, he affirmed his belief that the sole proprietorship was performing the contract.

Kang maintains that the evidence shows Integrated Enterprises, Inc. was the party to the contract, not the sole proprietorship. However, we conclude that substantial evidence supports the trial court's findings. The contract on its face was between Integrated Artisan Builders, and was executed by Yakel as owner thereof. He was a licensed sole proprietor doing business as Integrated Artisan Builders at the time and was not barred by Business and Professions Code section 7031 from seeking damages under the contract. (*Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694.) Although Yakel made a drafting error in describing Integrated Artisan Builders as being a corporate entity, he sent Kang a notice regarding that mistake three days before she signed the contract. Yakel's undisputed testimony shows that Integrated Enterprises, Inc. assumed the

8

contract after Yakel's license had been reassigned to it. Kang cites no authority to the effect that Integrated Enterprises, Inc. had no right to sue under the contract once it had assumed the same.

However, Kang does cite case law, having nothing to do with the assumption issue, that she says shows Integrated Enterprises, Inc. should be treated as an unlicensed contractor. She relies on *Opp v. St. Paul Fire & Marine Ins. Co.* (2007) 154 Cal.App.4th 71.

In that case, Mountain Connection, Inc., a Montana corporation, executed a contract for certain work. William Opp, as president of the corporation, executed the contract. The corporation did not have a California contractor's license, although Opp did. Opp's license number was inserted into various contract documents where a license number was required. When Mountain Connection, Inc. filed suit for payment, the defendant observed that Mountain Connection, Inc. was unlicensed. Thereafter, an amended complaint was filed substituting in "William Opp dba Mountain Connection and Mountain Connection, Inc." as plaintiff. (*Opp v. St. Paul Fire & Marine Ins. Co.*, *supra*, 154 Cal.App.4th at pp. 72-73.)

The evidence was undisputed that Mountain Connection, Inc. was the contracting party and that a license was required for the work in question. Consequently, its claim for payment was barred by Business and Professions Code section 7031. Furthermore, the court rejected Opp's argument that there was a triable issue of fact whether Mountain Connection, Inc. was a fictitious business name under which he operated. The court observed that Business and Professions Code section 17910.5 prohibited an individual from adopting a fictitious business name that included the word "Inc." (*Opp v. St. Paul Fire & Marine Ins. Co.*, *supra*, 154 Cal.App.4th at p. 75.)

The court in *Opp v. St. Paul Fire & Marine Ins. Co.*, *supra*, 154 Cal.App.4th 71 also rejected the argument that Mountain Connection, Inc. had been in substantial compliance with Business and Professions Code section 7031. It observed,

9

inter alia, that section 7031, subdivision (e) permits the application of the doctrine of substantial compliance in limited circumstances, where the contractor had been licensed in California prior to the performance of the contract, had acted in good faith, had not known that his or her license was invalid when the contract work commenced, and had acted promptly to reinstate the license upon learning of the invalidity. Inasmuch as Mountain Connection, Inc. had never been licensed in California, section 7031, subdivision (e) did not apply. (*Opp v. St. Paul Fire & Marine Ins. Co.*, *supra*, 154 Cal.App.4th at pp. 77-79.)

In the case before us, however, the contracting party was Integrated Artisan Builders, and Yakel signed the contract as the "owner" of Integrated Artisan Builders. At the time, Yakel held a valid contractor's license and did business as Integrated Artisan Builders. Although he anticipated that his license would be transferred to Integrated Enterprises, Inc. and that Integrated Enterprises, Inc. would assume the contract, this did not occur during the performance of the contract. The evidence supports the trial court's determination that the contracting party was Yakel, a sole proprietor, doing business as Integrated Artisan Builders, and that the contracting party was properly licensed at all times during the performance of the contract. Consequently, Business and Professions Code section 7031 is no bar to recovery. (*Ball v. Steadfast-BLK*, *supra*, 196 Cal.App.4th 694.) Unlike the matter in *Opp v. St. Paul Fire & Marine Ins. Co.*, *supra*, 154 Cal.App.4th 71, we do not have a situation where the contracting party was an unlicensed corporation.

In her reply brief, Kang argues that Integrated Enterprises, Inc. is precluded from arguing that the sole proprietorship was the contracting party inasmuch as that would be contrary to the wording of the complaint, and the pleadings are conclusive on the pleader. We do not address this issue inasmuch as it was raised for the first time in Kang's reply brief. (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 108.)

10

*B. Evidence:*

*(1) Introduction—*

Kang argues that the complaint basically sought lost profits, but that the claimed damages were entirely unsupported. She says the "evidence" of damages "consisted entirely of Exhibit 21," which was inadmissible hearsay. We disagree on several points.

Yakel testified extensively as to his damages. His testimony was evidence. Exhibit 15, which Kang does not challenge, was a construction estimate including calculations for overhead and profit. That exhibit was also evidence. Consequently, the claim that the only evidence was exhibit 21 is spurious.

We turn now to the assertion that exhibit 21 was inadmissible hearsay.

*(2) Exhibit 21—*

At trial, Yakel was asked about his damages. On direct examination, his attorney asked him to take a look at exhibit 21, an itemization the two of them had worked on together. The exhibit showed that, with reference to the original contract, a raw cost amount of $52,343.98 was added to an amount of $11,842.83 for anticipated project management overhead and profit, to arrive at a figure of $64,186.81 as the contract price.[1] The exhibit also showed how the amounts of the change orders were similarly calculated. The exhibit contained an estimate of $15,232.88 in total lost project management profits as part of damages. It also showed how Yakel determined total lost profits of $15,265.40 for markups on subcontracts and materials, broken down for each of the original contract and the three change orders. The exhibit also reflected $7,907.63 in costs for expenses Yakel had paid. Adding the various figures together, the exhibit showed $38,405.91 in estimated lost profits and expenses.

---

[1]     This figure was rounded up to $65,000 on the signed contract.

11

Ten thousand dollars, representing money Kang had already paid,[2] was subtracted from the $38,405.91 figure.  The resulting figure of $28,405.91 was described on exhibit 21 as "DAMAGES: LOST PROFITS PLUS EXPENSES MINUS PAYMENTS."

*(3) Testimony concerning exhibit 21—*

Yakel testified that the exhibit provided his estimate of how much revenue the contract would have generated.  He explained that he had invested a great deal of time for which he had not been paid.  He also mentioned that the damages included an estimate of what he would have made on subcontract and equipment markups.  He opined that his ultimate figure was conservative, although he did not quote the figure off the exhibit.

On cross-examination, Kang's attorney elicited additional testimony from Yakel on exhibit 21.  The attorney first asked Yakel about his figure of $15,232.88 for "lost project management profits" and questioned about making profits without having to do any construction work.  Yakel explained that he did demolition work, a lot of planning, organizing, "getting guys in order, [and] dealing with the client."  He further explained that they figured on how many man-hours the work would require.

Kang's attorney then referenced what he characterized as the "second $15,000 number," for lost profits on markups, as reflected in the exhibit.  He asked Yakel, "That's in addition to the 15,000 you've already listed, right?"  He also questioned, whether the "second $15,000 number" represented profits lost on marking up subcontracts such as plumbing contracts and electrical contracts, and equipment.  Yakel responded affirmatively to each question.  He emphasized that they did a great deal of

---

2    Yakel testified that he, together with a subcontractor, had performed some exploratory demolition on the property, such as removing flooring and ceilings, relocating pipes, exploring and noting any items that were not in compliance with building codes.  He further testified that Kang had paid $10,000 for that phase of the work.

12

planning work on the project and remarked that most of the work was "front-loaded." Yakel also indicated that he typically sought about 25 percent over raw costs "to cover supervision, overheads, profits, and everything." He opined that that was fair market value.

After extensive questioning about what he called the "second $15,000 number," Kang's attorney went on to ask about the $7,907.63 figure for "project expenses." Yakel testified that the figure included $1,200 to the city, $1,000 for a hood vendor, $300 for a sign company, and overhead.

Yakel was asked further questions about his itemization of damages on redirect examination. He then indicated that a portion of the $7,907.63 figure was for demolition work performed by a subcontractor who owed him money. Yakel also offered conceptual explanations. For example, he explained that he did not consider overhead to be part of profit. Rather, he said overhead consisted of "trips out there for gas, rent, telephone conversation[s], many of them, fax machine, paper, fax bills."

*(4) Analysis—*

Kang contends the court erred in admitting exhibit 21 because it was inadmissible hearsay. In support of her argument, Kang cites *People v. Murphy* (1936) 17 Cal.App.2d 575 for the general proposition that writings and reports are inadmissible unless an exception to the hearsay rule applies. She also cites Evidence Code section 1200, subdivision (b). She cites each authority in a cursory manner without any discussion or analysis.

Integrated Enterprises, Inc. responds in equal fashion, broadly asserting that exhibit 21 was not hearsay because it was demonstrative evidence. In support of this retort it cites only Evidence Code section 1200, subdivision (a), without analysis. It further asserts that even if the exhibit were hearsay, any error in the admission of the exhibit was harmless error, citing *Baltayan v. Estate of Getemyan* (2001) 90 Cal.App.4th 1427 and *People v. Murphy*, *supra*, 17 Cal.App.2d 575.

13

We will devote as much time to the issue as do the parties. We agree that even if exhibit 21 constituted inadmissible hearsay, the admission of the exhibit was harmless error. (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 525-527; *Rieger v. Arnold* (2002) 104 Cal.App.4th 451, 467-468; *People v. Murphy*, *supra*, 17 Cal.App.2d at p. 591.)

Yakel was questioned at length about the exhibit, and by counsel for each party. Although he did not testify as to each dollar figure on the exhibit, he testified as to "lost project management profits" of $15,232.88 and a "second $15,000"[3] for "lost profits on markups." He also testified concerning the $7,907.63 in project expenses paid and the $10,000 Kang had paid. The court's determination was based upon these figures and they are all the figures necessary to reach the $28,405.91 total damages amount. Any error was not prejudicial.

## C. Amount of Damages:

Finally, Kang argues that the court erred in awarding Integrated Enterprises, Inc. an amount exceeding the benefit of the bargain, that is, exceeding the amount of money that would have been earned if the contract had been fully performed. She also contends that it was improper to award damages because the amount of damages was uncertain.

The court initially found that Yakel's exhibit 21 calculations showing "$28,405.91 for his benefit of the bargain damages [were] correct and reasonable" and announced its intention to award damages in that amount. In response, Kang argued that Yakel was double dipping, seeking the benefit of the bargain damages as reflected on exhibit 15 plus markups on top of it. Kang also argued that the $7,907.63 in damages for expenses was completely unsupported. The court ultimately concluded that to award

---

[3]     The exact figure as shown on exhibit 21 was $15,265.40, but Kang's counsel kept referring to it as the "second $15,000 number."

14

$7,907.63 for project expenses, which should already have been figured into the contract pricing, was double dipping. So, it reduced the $28,405.91 figure by that amount, for a damages award of $20,498.28.

In reviewing the damages award, it is exhibit 15 which is the most compelling. Exhibit 15 was the construction estimate for the original construction contract, without change orders. The first five pages contained a detailed description of costs for plans and permits, demolition, plumbing, fixtures, electrical work, roofing, windows and doors, etc. The subtotal was $52,343.98, to which was added overhead of 12.5 percent or $6,543, and profit of 9 percent, or $5,299.83, for a total of $64,186.81. The total was rounded up to $65,000 for the contract amount.

So, exhibit 15 shows us that if the original construction contract had been performed without change orders, Yakel would have made $11,842.83 in overhead and profits. This is the exact figure shown on exhibit 21, which notes raw costs of $52,343.98 plus $11,842.83 in anticipated project management overhead and profit, for a total amount of $64,186.81, before rounding up. The $11,842.83 shows the amount that would have been the benefit of the bargain under the original construction contract, after payment for raw costs.

With respect to change order No. 1, exhibit 21 shows raw costs of $15,210 and anticipated project management overhead and profit of $1,263, for a total contract amount of $16,473. With respect to change order No. 2, exhibit 21 shows raw costs of $8,009 and anticipated project management overhead and profit of $1,931.45, for a total contract amount of $9,940.47. Finally, with respect to change order No. 3, exhibit 21 shows raw costs of $764 and anticipated project management overhead and profit of $195.60, for a total contract amount of $960. The total anticipated project management overhead and profit from the three changes orders is $3,390.05.

15

As exhibit 21 shows, the total amount of anticipated project management overhead and profit for the original contract plus the three change orders is $15,232.88. That is the total amount Yakel would have received for overhead and lost profits had the original contract and all three change orders been performed. Of course, his expenses would have been built into the contract as raw costs. So, $15,232.88 for overhead and profit, plus $7,907.63 in expenses, equals $23,140.51 in damages. However, we subtract from this amount $10,000 that Kang had already paid. The bottom line is $13,140.51.

"When the remedy given for breach of contract is money damages, the amount awarded is determined with the purpose of putting the injured party in as good a position as he would have occupied had the contract been performed." (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 56.) "'In determining the amount of compensation as the "damages" to be awarded, the aim in view is to put the injured party in as good a position as he would have had if performance had been rendered as promised.' [Citation.] [¶] Thus, a [trier of fact] 'must determine what additions to the injured party's wealth (expected gains) have been prevented by the breach and what subtractions from his wealth (losses) have been caused by it.' [Citation.]" (*Id.* at pp. 55-56.) Here, the expected gains on the contract plus three changes orders was $15,232.88 and the losses caused by the termination of the agreement were $7907.63, for a total of $23,140.51 in damages, minus the $10,000 that Kang had already paid.

We agree with Kang that to give Integrated Enterprises, Inc. another $15,265.40 in lost profits on markups would be double dipping. With respect to the original contract, for example, exhibit 21 shows raw costs of $52,343.98, plus anticipated project management overhead and profit of $11,842.83, plus $10,468.80 in lost profits on markups. But the total of those figures exceeds the $65,000 contract price by $9,655.61. Clearly, Yakel would not have received that extra $9,655.61 from Kang had the work been fully performed.

16

Put another way, Integrated Enterprises, Inc. sought $30,498.28 in lost profits for anticipated project management overhead and profit and profits on markups, on a total contract price of $91,560.28—the total negotiated price for the original contract and the three change orders. This is a profit exceeding 33 percent. Yet Yakel himself testified that he typically sought about 25 percent over raw costs "to cover supervision, overheads, profits, and everything." And the contract itself built in 21.5 percent—12.5 percent for overhead and 9 percent for profit. In short, in seeking the "second $15,000" in damages, as Kang's attorney phrased it, Integrated Enterprises, Inc. was striving to make more money on a damages lawsuit than it would have made had the contract and change orders been fully performed. This amount would exceed the benefit of the bargain measures of damages.

As a final word, we note that Kang complains Yakel's oral testimony concerning the $7,907.63 in expenses he claimed to have paid was largely unsubstantiated. However, Yakel's testimony was evidence and the court made no finding that Yakel was lacking in credibility. Rather, the court found that his exhibit 21 calculations for the benefit of the bargain were fair and reasonable and that he performed every obligation we was required to perform under the contract until the time that Kang terminated him. Indeed, the court specifically stated, when comparing exhibits 15 and 21, that Yakel did not appear to be "flimflamming anyone." The reason the court subtracted the $7,907.63 in expenses was not because it found Yakel's testimony on those expenses to be lacking in credibility, but because the court concluded that to include that amount in the final damages award would be double dipping. As we have already stated, however, the double dipping comes in when seeking lost profits twice, not in seeking compensation for expenses, which would fall into the category of unreimbursed raw costs.

17

### III

### DISPOSITION

The judgment is reversed only with respect to the amount of the damages award and affirmed in all other respects.  On remand, the court shall enter a judgment in favor of Integrated Enterprises, Inc. in the amount of $13,140.51, plus costs of suit.  In the interests of justice, each party shall bear its own costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

18