ARTHUR E. TATHAM and ANGELA B. TATHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tatham v. Commissioner
Docket No. 10564-76.
United States Tax Court
T.C. Memo 1979-205; 1979 Tax Ct. Memo LEXIS 322; 38 T.C.M. (CCH) 848; T.C.M. (RIA) 79205; May 22, 1979, Filed Frank V. Battle, Jr.,George W. Craven, II, and Robert E. Youle, for the petitioners. William L. Ringuette and Leo G. Pryma, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $39,875.87 in petitioners' 1970 Federal income tax. The sole issue for decision is whether petitioners are entitled to a casualty loss deduction under section 165(c)(3)[1] for *323 storm damage to their residential Lakefront property and, if so, in what amount. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time of filing their petition herein, Arthur E. Tatham (petitioner) and his wife, Angela B. Tatham, resided in Winnetka, Ill.
On April 22, 1960, petitioners purchased a residential lot on the shore of Lake Michigan in Winnetka, Ill. Winnetka is a suburb north of Chicago situated on the western shore of Lake Michigan. Petitione rs' lot was one of five lots in a subdivision bordered on the east by Lake Michigan, on the west by Hoyt Lane, on the north by Elm Street, and on the south by Oak Street. At the time petitioners purchased their lot it measured 324 feet on the north side, 332 feet on the south side, and 112.26 feet on both the east and west sides. From Hoyt Lane to the top of the lake bluff located on petitioners' property was 185 feet. The face of the bluff sloped downward toward the lake and consequently the toe or bottom of the bluff extended 42 feet beyond the top of the *324 bluff. From the toe of the bluff, the lower tableland, an area of mixed sand and clay, extended for 50 feet toward the lake and then dropped off six to eight feet to the beginning of a natural sand beach. When petitioners acquired this lot on April 22, 1960, the sand beach extended approximately 55 feet at its deepest point from the outer edge of the lower tableland to the water's edge. After purchasing this lot, petitioners had a one and one-half story five bedroom house constructed on it. The house was designed to take advantage of the property's lakefront location. The east side of the house, which faces the lake, is almost entirely theremopane glass. There is also a stone terrace on the east side of the house which extends to within 10 feet of the top of the bluff. Petitioners also built a wooden deck half way down the bluff with a stairway leading from the top of the bluff to the deck and from the deck down to the lower tableland. The total cost of the petitioners' lot, house, and improvements was as follows: Lot
$59,850.00
Legal fees -- lot purchase
1,000.00
Architect fees
15,878.11
House and landscaping
105,274.66
Bluff stairs
1,714.00
Driveway
605.50
$184,322.27
*325 During the summers prior to 1970, petitioners, their family, and their neighbors often used the beach for swimming and picnicking. Petitioners also had a motor boat which they were able to launch from the beach. In 1969 petitioners' two neighbors to the north, Mrs. Sturtevant Hinman (Hinman) and Mr. Albert Morey (Morey) became concerned about preventing damage to their lake bluffs from erosion. To remedy this problem, they contacted Thatcher Engineering Company (Thatcher). At a meeting, which petitioners attended, Thomas Wysockey (Wysockey), a civil engineer for Thatcher, recommended that seawalls be constructed parallel to the shoreline of the Hinman and Morey properties and that a steel jetty be constructed perpendicular to the shoreline at the south end of petitioners' property. It was Wysockey's opinion that the construction of the seawalls would prevent the erosion of the lake bluffs on the Hinman and Morey properties, and that the construction of the steel jetty would promote the accretion of sand along the shore of all three properties. Wysockey did not recommend that a seawall be constructed along petitioners' shoreline because their lower tableland served as a natural *326 seawall which prevented the waves from eroding their lake bluff. Thereafter, during the summer of 1969, Thatcher built the seawalls along the shore of the Hinman and Morey properties and the jetty at the south end of petitioner's property. The jetty as constructed was 210 feet in length and extended from the toe of petitioners' bluff out into the lake. The seawalls cost a total of $32,000 to construct and the jetty cost $25,000 to construct. Hinman and Morey paid all the costs of their respective seawalls. In addition, Hinman and Morey each contributed $5,000 toward the cost of the jetty and petitioners paid the remaining $15,000. As of the summer of 1969, there was a distance of 85 to 90 feet from the toe of petitioners' bluff to the shore of Lake Michigan. Fifty feet of this distance was lower tableland and 35 to 40 feet of this distance was sand beach. On March 25 and 26, 1970, and again on April 1 and 2, 1970, major storms hit the Chicago area. Wind gusts at Midway Airport were officially clocked at 44 mph from the northeast on March 26. On April 2 winds officially gusted to 52 mph from the north. Waves on the lakefront were in excess of eight feet during both of these *327 storms. During the week of the first storm, petitioner inspected his shoreline and discovered that his entire sand beach had been washed away as well as part of his lower tableland. After the second storm, petitioner again inspected his shoreline and discovered that the remainder of the lower tableland had been swept away. In addition, the storms damaged the stairs leading from the deck to the lower tableland and destroyed some of the shrubbery and trees that had grown on the face of the bluff. When the storms had finally passed, petitioner telephoned Wysockey who came out and inspected the damage the storms had done to petitioners' property. On Wysockey's recommendation, a wall of sandbags was placed along the toe of petitioners' bluff to prevent any erosion of the bluff itself by the action of the waves until a more permanent solution could be decided upon. Since petitioners realized that it was not feasible to replace the sand beach by dredging sand up from the bottom of the lake, it was agreed that Thatcher would return and extend the Hinman-Morey seawall across petitioners' property. In the fall of 1970, Thatcher extended the seawall along petitioners' shoreline and *328 joined it to the steel jetty. The seawall was backfilled with sand and gravel in order to bring the area inside the seawall up to the same level as the original lower tableland. Petitioners agreed to pay Thatcher $14,000 for the construction of the seawall. However, they had not yet paid this amount when, during a storm in the winter of 1970, the seawall collapsed. After Thatcher returned once again and replaced the seawall, the petitioners paid Thatcher the $14,000. After their natural sand beach was destroyed, petitioners no longer used the shore area for picnicking or swimming because the seawall backfill was not suitable for these activities. To obtain estimates of the storm damage to his property, petitioner contacted two real estate saleswomen who worked in the Winnetka area. In a written statement attached to petitioners' 1970 Federal income tax return, Nancy Channer (Channer) stated that the storm damage to petitioners' property reduced its fair market value by at least $60,000. In a similar statement also attached to petitioners' 1970 return, Ruth Elwood (Elwood) stated that the damage reduced the property's fair market value by at least $62,000. Although both *329 Channer and Elwood provided petitioners with written appraisals, only Elwood testified for petitioners at trial. Elwood is a licensed real estate saleswoman who has worked in Winnetka for 32 years. During that time she has specialized in the purchase and sale of residential properties along the shore of Lake Michigan in the Winnetka area. Elwood estimated that petitioners' property prior to the storm damage would have had a fair market value of $225,000. After viewing the property, her estimate of its decline in value as a result of the storm damage was based on two components: the cost of repairing the actual damage and the loss of the natural sand beach. She estimated the cost of repairs would be approximately $30,000. This figure included $12,350 to build a seawall and $15,950 to extend the jetty to a point 50 feet farther into the lake. Her estimate of the decline in the property's value due to the loss of the natural sand beach was $32,000. Relying on these two appraisals, the petitioners deducted $60,900 as a casualty loss on their 1970 Federal income tax return. In the statutory notice, the respondent disallowed this deduction in its entirety. OPINION The sole *330 issue for decision is whether petitioners are entitled to a casualty loss deduction under section 165(c)(3) for storm damage to their residential lakefront property and, if so, in what amount. Section 165(c)(3) permits an individual to deduct losses suffered on the damage or destruction of nonbusiness property by reason of fire, storm, or other casualty to the extent that the loss from each casualty exceeds $100 and is not compensated for by insurance or otherwise. To establish a casualty loss petitioners must show that their loss resulted from a sudden or unexpected event. Durden v. Commissioner,3 T.C. 1, 5 (1944). The term "casualty" excludes the progressive deterioration of property through a steadily operating cause. Durden v. Commissioner,supra, at 3. At the trial of this case, petitioners made it clear that their beach and lower tableland were washed away by the sudden winter storms and not by the gradual process of erosion. We, therefore, ruled from the bench that petitioners had sustained a casualty loss within the meaning of section *331 165(c)(3). [2] Thus, the only issue that remains for our determination is the amount of such loss. The petitioners have the burden of proof on this issue. Pfalzgraf v. Commissioner,67 T.C. 784, 787 (1977). The proper measure of a casualty loss is the difference between the fair market value of the property immediately before the casualty and its fair market value immediately thereafter, but not exceeding its adjusted basis. Helvering v. Owens,305 U.S. 468, 471 (1939); Lamphere v. Commissioner,70 T.C. 391, 395 (1978). Section 1.165-7(a)(2), Income Tax Regs., provides that the relevant fair market values shall be ascertained by competent appraisal or by proof of the cost of repairs. Furthermore, while an individual who uses the cost of repair method to determine fair market value cannot rely on mere estimated costs of repair, when the appraisal method is used an appraiser who determines the decline in fair market value of property may *332 properly take into consideration the estimated cost to repair the property or restore it to its original condition. Pfalzgraf v. Commissioner,supra, at 792. In the present case, petitioner obtained written appraisals of the decline in value of his property due to the storm damage from two real estate saleswomen, Channer and Elwood, both of whom worked in the Winnetka area. In her appraisal, Channer stated that the storm damage to petitioners' property reduced its fair market value by at least $60,000. Elwood appraised the decline in value of the petitioners' property at $62,000. Elwood, who testified for petitioners at trial, is a licensed real estate saleswoman who has worked in Winnetka for 32 years. During that time, she has specialized in the purchase and sale of residential properties along the shore of Lake Michigan. Relying on her knowledge of the local real estate market, Elwood estimated that petitioners' property immediately prior to the storm damage would have had a fair market value of $225,000. After viewing the property, her estimate of its decline in value was based on two components: the cost of repairing the actual damage and the loss *333 of the natural sand beach. Elwood estimated that the cost of repairs would be approximately $30,000. This figure included $12,350 to build a seawall along the shoreline of petitioners' property. The seawall was necessary because it would provide petitioners' lake bluff with the same type of protection from erosion that the lower tableland had provided prior to the storms. Also included was $15,950 to extend petitioners' jetty to a point 50 feet farther into the lake. Elwood's estimate of the decline in the property's value from the loss of the natural sand beach was $32,000. She testified that this reduction in value of $32,000 was attributable to the fact that lakefront property with a natural sand beach along Lake Michigan was more valuable than property with only a seawall because of the aesthetics and the greater facility for swimming and boating that a sand beach provided. We found Elwood's testimony candid, forthright, and credible. In addition, her knowledge of the real estate market in the Winnetka area was extensive. Moreover, respondent offered no evidence which contradicted Elwood's appraisal of the fair market value of petitioners' property prior to the storms or *334 her estimate that the property declined in value $62,000 as a result of the damage caused by the storms. We, therefore, conclude that Elwood's appraisal of the decline in value of petitioners' property was correct with one exception. When Elwood calculated the decline in value she included $15,950 to extend the petitioners' jetty 50 feet farther into the lake. Such extension of the jetty would be a capital improvement to petitioners' property which is completely unrelated to the loss they suffered as a result of the storms. Thus, Elwood's appraisal of $62,000 must be reduced by $15,950, leaving petitioners with a $46,050 casualty loss. Respondent argues that if the Court determines petitioners suffered a casualty loss, the amount of such loss must be reduced by the fair market value of the seawall installed by Thatcher on petitioners' property in 1970 because construction of this seawall constituted compensation within the meaning of section 165(a). It is clear from the record, however, that petitioners paid Thatcher for the construction of this seawall. Thus, petitioners received no compensation from Thatcher for their loss. Moreover, it is equally clear that petitioners' adjusted *335 basis in their property far exceeds their loss. Accordingly, we hold that petitioners sustained a casualty loss under section 165(c)(3) in the amount of $46,050. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, and in force during the years in issue.↩
2. See Getz v. Commissioner,T.C. Memo. 1965-110↩.