T.C. Memo. 2018-78

UNITED STATES TAX COURT

JAMES N. GAUNT AND LILLIAN GAUNT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17513-15L.                    Filed June 6, 2018.

<u>Wayne J. King</u>, for petitioners.

<u>Scott A. Hovey</u> and <u>Jacob Russin</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  The posture of this collection due process (CDP) case is somewhat unusual.  Petitioners have conceded that the Internal Revenue Service (IRS or respondent) did not abuse its discretion in sustaining a notice of intent to levy relating to their 2008, 2009, and 2010 tax years.  Instead, they dispute only the liabilities underlying the levy notice, which resulted from a notice of defici-

**[*2]** ency issued to them in 2014.  Respondent has conceded that petitioners never received that notice of deficiency and that they properly challenged their underlying liabilities at their CDP hearing and in their petition.  <u>See</u> sec. 6330(c)(2)(B); Rule 331(b)(4); sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs.[1]  We therefore consider petitioners' underlying liabilities on the merits.

After concessions (described below) the issues for decision are whether petitioners may deduct:  (1) certain expenses reported on Schedule C, Profit or Loss From Business, of their 2008 return; (2) a theft loss reported on their return for 2010; and (3) net operating losses (NOLs) reported on their returns for 2009 and 2010.  We will generally sustain respondent's determinations.

FINDINGS OF FACT

The parties filed two stipulations of fact with attached exhibits that are incorporated by this reference.  Petitioners resided in California when they timely petitioned this Court.

During the years in issue James Gaunt (petitioner) was the sole proprietor of All American Pool and Spa (AAPS).  AAPS built in-ground pools (and to a lesser extent, spas).  Most of its clients were homeowners in Los Angeles.  Petitioner's

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*3] role at AAPS was that of a general contractor:  He would negotiate a fee for a project, then hire and supervise subcontractors to perform whatever tasks were required.  These subcontractors included excavators, steelworkers, electricians, cement masons, tilers, and landscapers.  In most instances AAPS paid the subcontractors by check.

Petitioner's son, David, owned a plumbing company called David Gaunt Pool Services (DGPS).  DGPS designed plumbing systems for pools and often worked on the same projects as AAPS.  DGPS was not a subcontractor to AAPS and negotiated its fee directly with customers.  But this arrangement was complicated by the fact that David lacked a general contractor's license.  Petitioner, who had the required license, sometimes agreed to accept payments on his son's behalf.  He deposited each payment into an AAPS bank account and then remitted it, either in cash or by check, to David.  He remitted at least $20,745 to David or DGPS during 2008.

Demand for AAPS' services declined sharply in 2009 as the financial crisis took its toll.  In an effort to supplement his income, petitioner began a venture in which he sold sandwiches from a trailer.  Petitioner drove the trailer to several events, including a renaissance fair and the San Diego Street Fair, each of which required vendors to pay an admission fee of at least $1,000.  Petitioner never sold

[*4] enough sandwiches to recoup the admission fees--not to mention the cost of fuel, licenses, and sandwich supplies--and abandoned this activity after eight months.

During the years in issue petitioners owned real property in Fontana, California. The Fontana property consisted of a house and a 2,700-square-foot detached garage. Petitioners used the garage to store infrequently used possessions, including obsolete pool-building supplies, personal effects, and two antique cars.

Petitioners did not regularly visit the Fontana property but were, on account of the neighborhood in which it was located, reluctant to leave it unattended. They accordingly turned to Tony Heathcoat,[2] one of petitioner's business associates, who agreed to reside at and oversee the Fontana house in lieu of paying rent.[3] In early 2010 Mr. Heathcoat moved to Nevada for medical treatment. Petitioners were not aware of his departure, and a group of itinerants moved into the Fontana house. It promptly fell into disrepair.

---

[2]The surname of this individual is unclear from the record. Petitioner testified that he regularly purchased PVC pipe from a business associate named Tony Heathcliff. However, various checks in the record were issued to Tony Heathcoat for PVC pipe. A police report and insurance claim refer to Tony Heathcoat as the caretaker of the Fontana property.

[3]Respondent has not alleged that Mr. Heathcoat's services constituted rental income to petitioners.

**[*5]** In March 2010 David drove past the Fontana property and noticed that the garage door was ajar. He entered the garage and discovered that many of petitioners' items, including the antique cars, were missing. David reported the incident to petitioners and to the Fontana Police Department (FPD). Petitioner subsequently submitted to the FPD a 37-page list of items that he believed had been stolen. In total he reported as missing approximately 1,000 items, including vending machines, stoves, radio-controlled toy cars, and tools that he had inherited from his father. The FPD conducted several interviews and prepared a detailed report of its findings. As of the time of trial, however, it had not determined who was responsible for the theft and had recovered only a few of the missing items.

Petitioners maintained homeowners' insurance on the Fontana property. They purchased their policy--which carried a liability limit of $310,226--from the Allstate Indemnity Co. (Allstate). After learning of the theft, petitioner filed a claim for reimbursement with Allstate and estimated that the stolen property had a fair market value of $749,477.

Petitioners pursued their insurance claim throughout 2010 and for several years thereafter. Allstate ultimately denied their claim in 2016, finding that petitioners had subjected their property to an "increase in hazard" by entrusting it to a caretaker; that petitioners should have converted their policy from homeowners'

[*6] insurance to landlord's insurance; and that, in any event, landlord's insurance would not have covered petitioners' personal items stored in the garage.

Petitioners jointly filed Forms 1040, U.S. Individual Income Tax Return, for the years in issue. Petitioners' 2008 and 2009 returns were untimely; their 2010 return was timely filed. Each return attached a Schedule C relating to AAPS.[4]

The IRS selected petitioners' 2008, 2009, and 2010 tax returns for examination and issued petitioners a notice of deficiency. The notice of deficiency: (1) determined that petitioners had understated AAPS' gross receipts for 2008, 2009, and 2010; (2) disallowed various expense deductions relating to AAPS; (3) disallowed an NOL and theft loss deduction claimed on their 2010 return; (4) partially disallowed a home mortgage interest deduction claimed for 2008; (5) increased petitioners' home mortgage interest deduction for 2009; (6) determined that petitioners had failed to report retirement distributions for 2008 and 2009; (7) determined additional tax for early retirement withdrawals in 2008 and 2009; (8) determined that petitioners had failed to report interest income for 2008; (9) determined a section 6662 accuracy-related penalty for each year; and (10) determined section 6651(a)(1) late-filing additions to tax for 2008 and 2009.

---

[4]It is not clear whether petitioners reported any income or expenses attributable to the food trailer on their 2009 return.

**[*7]** Petitioners did not receive the notice of deficiency and did not file a petition with this Court. Respondent thereupon assessed the deficiencies, penalties, and additions to tax shown on the notice of deficiency and issued petitioners a levy notice. They timely requested a CDP hearing; at the hearing they challenged only the liabilities underlying the levy notice. The settlement officer assigned to their case sustained the proposed levy and issued petitioners a notice of determination. They timely petitioned the Court.

Before trial petitioners submitted to respondent what they called a "pro forma" return for each year in issue. (These returns, which the IRS did not process, were essentially amended returns, and we will refer to them as such.) On Schedules C relating to AAPS, the amended returns reported the following:

| Item | 2008 | 2009 | 2010 |
|---|---|---|---|
| Gross receipts | $330,062 | $47,934 | $137,356 |
| Returns and allowances | -0- | -0- | -0- |
| Cost of goods sold | -0- | 55,811 | -0- |
| Total expenses | 296,480 | 153,337 | 104,188 |
| Profit (loss) | 33,582 | (161,214) | 33,168 |

[*8] The AAPS expenses reported on the amended Schedule C for 2008 were:

| Expense | Amount |
|---|---|
| Advertising | $11,417 |
| Car and truck | 10,369 |
| Contract labor | 127,297 |
| Depreciation/sec. 179 | 10,270 |
| Insurance | 9,420 |
| Interest | 4,205 |
| Legal/professional services | 500 |
| Office expense | 4,023 |
| Rent/lease | 1,725 |
| Supplies | 83,811 |
| Travel | 4,542 |
| Utilities | 3,055 |
| Other expenses | 25,846 |
| Total | 296,480 |

Petitioners' amended return for 2009 claimed an NOL deduction of $113,393. Their amended return for 2010 claimed an NOL deduction of $18,128 and reported a $727,404 theft loss.

In a stipulation of settled issues, the parties agreed that petitioners were liable for late-filing additions to tax for 2008 and 2009; that petitioners were not liable for any accuracy-related penalties; and that petitioners' amended returns-- which conceded many of the adjustments listed in the notice of deficiency--were generally accurate. They reserved the following issues for trial: (1) whether petitioners had understated AAPS' gross receipts for 2009; (2) whether the sum of

[*9] AAPS' cost of goods sold (COGS) and expenses for 2008, 2009, and 2010 exceeded $233,127, $143,638, and $70,610, respectively;[5] (3) whether petitioners were entitled to a theft loss deduction for 2010; and (4) whether petitioners were entitled to an NOL deduction for 2009 or 2010.

At the close of trial the Court ordered one round of seriatim briefs. In their answering brief petitioners conceded that for 2009 they had understated AAPS' gross receipts in the amount alleged by respondent. Petitioners further conceded that the sum of their Schedule C expenses and COGS for 2009 and 2010 did not exceed $143,638 and $70,610, respectively, viz., the "floor" amounts allowed in the stipulation of settled issues. Thus, the only Schedule C expenses remaining in dispute are those reported for 2008.

OPINION

I.    Standard of Review and Burden of Proof

Section 6330(d)(1) does not prescribe the standard of review that this Court should apply in reviewing an IRS administrative determination in a CDP case. But our case law tells us what standard to adopt. Where the validity of the under-

_____

[5]The parties stipulated that "petitioners * * * [were] entitled to total Schedule C cost of goods sold and expenses" in the stated amounts but that the total amount of those items "remain[ed] in dispute." In effect, the stipulation established a floor for these items but reserved for trial whether petitioners could substantiate larger amounts.

**[*10]** lying liability is not at issue, the Court reviews the IRS' determinations for abuse of discretion. <u>Goza v. Commissioner</u>, 114 T.C. 176, 181-182 (2000). Where (as here) the underlying liability is properly at issue, we review the IRS' determinations de novo. <u>Ibid.</u>

A taxpayer may dispute his underlying liability in a CDP case only if he did not receive a notice of deficiency or otherwise have an opportunity to contest that liability. Sec. 6330(c)(2)(B). The taxpayer must raise his underlying liability during his CDP hearing by challenging and presenting evidence relating to the underlying liability. <u>See</u> sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs. The taxpayer must also contest his underlying liability in his petition. Rule 331(b)(4). The parties agree that petitioners did not receive the notice of deficiency for the years in issue and that they properly challenged their underlying liabilities during their CDP hearing and in their petition. We will review those liabilities de novo.

The IRS' determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving them erroneous. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Petitioners do not contend--and could not plausibly contend--that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

**[*11]** II.     Schedule C Expenses

Section 162(a) allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." A necessary expense is one that is "appropriate and helpful" to the taxpayer's business; an ordinary expense is one that is common or frequent in the type of business in which the taxpayer is engaged. Deputy v. du Pont, 308 U.S. 488, 495 (1940); Welch v. Helvering, 290 U.S. at 113. Personal, living, and family expenses are generally not deductible. Sec. 262.

Deductions are a matter of legislative grace. Taxpayers must prove their entitlement to deductions allowed by the Code and substantiate the amounts of any deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. They also must produce records sufficient to enable the IRS to determine their correct liabilities. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. The failure to keep and present such records weighs heavily against a taxpayer's attempted proof. Rogers v. Commissioner, T.C. Memo. 2014-141, 108 T.C.M. (CCH) 39, 43.

If a taxpayer with inadequate business records proves that he paid certain expenses but cannot substantiate the exact amount, the Court may in appropriate cases estimate the amount allowable. Cohan v. Commissioner, 39 F.2d 540, 543-

[*12] 544 (2d Cir. 1930); Key Carpets, Inc. v. Commissioner, T.C. Memo. 2016-30, 111 T.C.M. (CCH) 1126, 1128.  But the Court is not required to guess at a number; rather, "we must have some basis upon which an estimate may be made." Polyak v. Commissioner, 94 T.C. 337, 346 (1990); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).  In making an estimate under the Cohan rule, the Court "bear[s] heavily * * * upon the taxpayer whose inexactitude is of his own making."  Cohan, 39 F.2d at 544.

Section 274(d) imposes strict substantiation requirements for deductions claimed for (among other things) "listed property."  Listed property includes "any passenger automobile."  Sec. 280F(d)(4)(A)(i).  No such deduction is allowed unless the taxpayer substantiates, by adequate records or by sufficient evidence corroborating his statements, the amount, time, place, and business purpose of each expenditure.  Sec. 274(d); sec. 1.274-5T(a), (b), and (c), Temporary Income Tax Regs., 50 Fed. Reg. 46014-46017 (Nov. 6, 1985).  A court may not apply the Cohan rule to approximate expenses covered by section 274(d).  Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969).

**[*13]** A.     Advertising Expenses

Petitioners reported on their 2008 amended Schedule C advertising expenses of $11,417.  At trial they explained that these expenses were for several phone numbers used by AAPS, for AAPS' website, and for purchasing online advertisements.  They identified on AAPS' bank account statements debits relating to these items.  Respondent in his post-trial brief conceded that petitioners had substantiated $5,798 of advertising expenses.  After carefully parsing the bank account statements, we conclude that petitioners have not substantiated advertising expenses beyond those conceded by respondent.  Petitioners are therefore entitled to an advertising expense deduction of $5,798 for 2008.

B.     Car and Truck Expenses

Petitioners reported on their 2008 amended Schedule C car and truck expenses of $10,270.  Petitioners did not discuss these expenses at trial or on brief.  The only clue as to their origin is a statement included with petitioners' amended return, which cites expenses for fuel and repairs for two vehicles used by AAPS.  Petitioners produced no mileage logs, receipts, or other substantiation for these expenses and did not demonstrate that the vehicles listed on their return were excepted from the heightened substantiation requirements of section 274.  See secs.

**[\*14]** 274(d)(4), 280F(d)(5)(B).  Accordingly, they are not entitled to any deduction for car and truck expenses.

### C.     Contract Labor Expenses

Petitioners reported on their 2008 amended Schedule C contract labor expenses of $127,297.  Petitioners submitted evidence to substantiate payments of $80,845 by check.[6]  These checks included a $4,400 check issued on December 19, 2007, and $20,745 of checks issued to David or DGPS.  Respondent contends that the checks referenced in the previous sentence do not give rise to a deduction, and we agree.  Because the $4,400 check was issued in 2007, it cannot generate a deduction for 2008.  See sec. 162(a); Cain-White & Co. v. Commissioner, T.C. Memo. 1978-438, 37 T.C.M. (CCH) 1829, 1830.  And because DGPS was not a subcontractor to AAPS, checks issued to it (or to David on its behalf) were not "ordinary and necessary" expenses of AAPS' business and hence were not deductible.  We therefore find that petitioners are entitled to a deduction for contract labor of only $55,700 ($80,845 − [$4,400 + $20,745]).

---

[6]Petitioners assert that they paid another $46,452 of contract labor expenses by cash and credit card.  But they produced no credit card statements, invoices, or other documents corroborating this assertion.  That assertion in any event is contradicted by petitioner's testimony at trial, when he estimated that he paid 99% of AAPS' contract labor expenses by check during the years in issue.

**[\*15]** D.     Depreciation/Section 179 Expenses

Petitioners reported on their 2008 amended Schedule C depreciation and section 179 expenses of $10,270.  This deduction relates to two vehicles used by AAPS.  Respondent in his post-trial brief conceded these expenses in full.  We accordingly conclude that petitioners are entitled to a deduction of $10,270 for depreciation.

E.     Insurance Expenses

Petitioners reported on their 2008 amended Schedule C insurance expenses of $9,420.  Petitioners did not explain these expenses at trial or present evidence to substantiate them.  We accordingly conclude that they are not entitled to any deduction for insurance expenses.

F.     Interest Expenses

Petitioners reported on their 2008 amended Schedule C interest expenses of $4,205.  Petitioners conceded these expenses at trial, explaining that their tax preparer had incorrectly reported their home mortgage interest as a business expense.  We accordingly conclude that they are not entitled to any Schedule C deduction for interest.

[*16] G.    Legal and Professional Services Expenses

Petitioners reported on their 2008 amended Schedule C legal and professional service expenses of $500.  Respondent in his post-trial brief conceded this deduction in full.  We accordingly conclude that petitioners are entitled to a deduction of $500 for legal and professional services.

H.    Office Expenses

Petitioners reported on their 2008 amended Schedule C office expenses of $4,023.  Respondent in his post-trial brief conceded this deduction in full.  We accordingly conclude that petitioners are entitled to a deduction of $4,023 for office expenses.

I.    Rent or Lease Expenses

Petitioners reported on their 2008 amended Schedule C expenses of $1,725 for renting or leasing business property.  Petitioners did not explain these expenses at trial or substantiate them.  We accordingly conclude that they are not entitled to any deduction for rent or leasing expenses.

J.    Supplies Expenses

Petitioners reported on their 2008 amended Schedule C expenses of $83,811 for supplies.  They produced at trial no documentation substantiating these expenses, nor did they explain what supplies AAPS required or where those supplies

[*17] were purchased. Respondent nevertheless conceded in his post-trial brief that petitioners were entitled to a deduction of $48,228 for supplies. We conclude that they are entitled to a deduction in the amount respondent conceded.

### K. Travel Expenses

Petitioners reported on their 2008 amended Schedule C travel expenses of $4,542. Petitioners did not explain these expenses at trial or present any documentation substantiating them. We accordingly conclude that they are not entitled to any deduction for travel expenses for 2008.

### L. Utilities Expense

Petitioners reported on their 2008 amended Schedule C utilities expense of $3,055. Petitioners did not explain this expense at trial or present any documentation substantiating it. We accordingly conclude that they are not entitled to a deduction for utilities expense.

### M. Other Expenses

Petitioners reported on their 2008 amended Schedule C "other expenses" of $25,846. These expenses were allegedly incurred for: (1) permits; (2) bank fees; (3) telephone; (4) tools; and (5) vehicular equipment. Petitioners made no attempt to substantiate these expenses at trial or on brief. (In any event, the telephone expenses would appear to duplicate the advertising expenses reported elsewhere on

**[*18]** petitioners' return.  See supra p. 13.)  Respondent in his post-trial brief

concede $3,580 of the claimed expenses--namely, $2,184 for permits, $1,170 for

tools, and $226 for bank fees.  We conclude that petitioners are entitled to a

deduction for "other expenses" in the amounts respondent conceded.

N.    Conclusion

The expenses substantiated by petitioners or conceded by respondent total

$128,099.  This amount is less than the $233,127 "floor" to which respondent, in

the stipulation of settled issues, agreed that petitioners for 2008 were entitled.  We

accordingly expect that the Rule 155 computations will reflect Schedule C adjust-

ments to income and deductions, for COGS and business expenses, respectively,

in the total amount of $233,127 for 2008.[7]

---

[7]In their post-trial brief petitioners argue that they substantiated $10,403
more in advertising expenses and $25,145 more in subcontractor expenses than
respondent conceded.  According to petitioners, they should thus be entitled to
Schedule C deductions of $268,675, viz., the $233,127 "floor" allowed in the sti-
pulation of settled issues + $10,403 + $25,145.  Petitioners are improperly trying
to have it both ways.  The stipulation did not state what expenses petitioners had
substantiated.  Rather, it left that issue for trial, providing that petitioners would be
afforded at least $233,127 of expenses for 2008, regardless of their proof at trial.
Although petitioners at trial substantiated more expenses in two expense categor-
ies than conceded by respondent, they struck out in most other expense categories.
Overall, the expenses they substantiated at trial were $105,028 less than respon-
dent has allowed.  They should be grateful for his generosity.

[*19] III.     Theft Loss Deduction

Section 165(a) permits a deduction for losses sustained during the taxable year and not compensated for by insurance or otherwise.  In the case of an individual, a loss is deductible under section 165(a) only if the loss:  (1) is "incurred in a trade or business"; (2) is incurred in a "transaction entered into for profit"; or (3) "arise[s] from fire, storm, shipwreck, or other casualty, or from theft."  Sec. 165(c).  "Theft" is broadly defined to include larceny, embezzlement, and robbery. Sec. 1.165-8(d), Income Tax Regs.; see Bellis v. Commissioner, 61 T.C. 354, 357 (1973), aff'd, 540 F.2d 448 (9th Cir. 1976).

In order to deduct a theft loss, the taxpayer must prove "the fair market value of the stolen property before the theft and the adjusted basis of the property." Sheridan v. Commissioner, T.C. Memo. 2015-25, 109 T.C.M. (CCH) 1130, 1131; sec. 1.165-8(c), Income Tax Regs. (providing that the amount of a theft loss deduction "shall be determined consistently with the manner prescribed in § 1.165-7 for determining the amount of casualty loss").  To prove fair market value, the taxpayer generally must supply a "competent appraisal" of the stolen property.  Sec. 1.165-7(a)(2)(i), Income Tax Regs.  The appraisal must "recognize the effects of any general market decline affecting" the property, so that any deduction will be "limited to the actual loss resulting from damage to the property."  Ibid.  "Adjusted

[*20] basis" is computed as if the taxpayer had sold or otherwise disposed of the stolen property.  See id. para. (b)(1)(ii).

A theft loss is usually treated as sustained in the tax year "in which the taxpayer discovers such loss."  Sec. 165(e); sec. 1.165-1(d)(3), Income Tax Regs.  But if there is a pending claim for reimbursement with respect to the loss, no portion of the loss is treated as sustained "until it can be ascertained with reasonable certainty whether or not such reimbursement will be received."  Sec. 1.165-1(d)(2)(i), (3), Income Tax Regs.  "Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact."  Id. para. (d)(2)(i).  If a taxpayer contends that the year of loss "is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release."  Ibid.

The parties agree that petitioners suffered a theft at the Fontana property during 2010.  They disagree, however, as to whether the theft entitles petitioners to a deduction under section 165.  For at least three reasons, we conclude that petitioners are not so entitled.

First, petitioners did not offer a "competent appraisal" of the stolen property, see sec. 1.165-7(a)(2)(i), Income Tax Regs., and they otherwise failed to establish its fair market value.  Petitioner testified that he determined the fair market

[*21] values of the missing items by finding similar items on auction websites. But petitioners' failure to enter the auction listings into evidence prevents us from evaluating how closely the auction prices match the values petitioners proffered. See Manning v. Commissioner, T.C. Memo. 1980-159, 40 T.C.M. (CCH) 298, 299-300. Similarly, petitioners did not demonstrate that they were sufficiently familiar with the fair market values of the missing items, such as the antique cars, for us to rely on their estimates. See Tatham v. Commissioner, T.C. Memo. 1979-205, 38 T.C.M. (CCH) 848, 850-851. Many of the values petitioners proffer--e.g., valuing three copper kitchen pots at $3,700--seem implausible on their face. See Sykes v. Commissioner, T.C. Memo. 2010-84, 99 T.C.M. (CCH) 1351, 1353, aff'd, 479 F. App'x 90 (9th Cir. 2012); Corby v. Commissioner, T.C. Memo. 1980-96, 40 T.C.M. (CCH) 21, 23.

Second, petitioners presented no evidence (such as receipts) demonstrating the missing items' costs or adjusted bases. Many of the missing items constituted equipment and supplies relating to AAPS' pool-construction business. It would appear, judging from petitioners' returns for the years in issue, that they elected to expense many of these items on prior year returns. With respect to such items, they would have adjusted bases of zero. See sec. 179; sec. 1.179-1(f)(2), Income Tax Regs. Petitioners presented no evidence on this point.

[*22] Finally, we are not convinced that the recovery petitioners sought with respect to their insurance claim was so unlikely that they could claim a deduction for 2010. They had a pending claim for reimbursement from Allstate throughout 2010, and they spent the next six years pursuing that claim. Petitioners have not carried their burden of proving that they had no "reasonable prospect of recovery" on this claim at year-end 2010. See sec. 1.165-1(d)(2)(i), Income Tax Regs. We accordingly sustain respondent's disallowance of the theft loss deduction.[8]

IV.    NOL Deductions

A taxpayer may generally deduct, as an NOL for a taxable year, an amount equal to the sum of the NOL carryovers and carrybacks to that year. Sec. 172(a). A taxpayer claiming an NOL deduction must file with his return "a concise statement setting forth the amount of the * * * [NOL] deduction claimed and all material and pertinent facts relative thereto, including a detailed schedule showing the computation of the * * * [NOL] deduction." Sec. 1.172-1(c), Income Tax Regs. Petitioners bear the burden of establishing both the existence of NOLs for prior or subsequent years and the amount of the NOL that may properly be carried to the

---

[8]Petitioners contend that, even if they had a reasonable prospect of recovery on their insurance claim in 2010, they were nevertheless entitled to claim a deduction for the excess of the stolen items' value over their policy limit. See sec. 1.165-1(d)(2)(ii), Income Tax Regs. Having found that petitioners failed to establish the items' fair market values or bases, we reject this contention.

**[\*23]** year in issue.  <u>See</u> Rule 142(a); <u>Keith v. Commissioner</u>, 115 T.C. 605, 621 (2000).

Petitioners' 2009 and 2010 amended returns claimed NOL deductions of $113,393 and $18,128, respectively.  Although petitioners did not attach to their amended returns a statement describing the NOL deductions, they explained in their post-trial brief that the NOL deductions originated from the theft loss that petitioners had claimed for 2010.  Because petitioners are not entitled to a theft loss deduction, they are not entitled to corresponding NOL deductions.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.